MARILYN M. COWAN, FORMERLY KNOWN AS MARILYN M. LOMBARDO, PLAINTIFF-RESPONDENT, v. RICHARD DOERING, M.D., ALEXANDRE ACKAD, M.D., AND CAROLE ELTRIDGE, R.N., DEFENDANTS-APPELLANTS, AND ALLWYN J. LEVINE, M.D., LOIS PAPP, R.N., CHRIS TAYLOR, R.N., KATHLEEN BARLICS, R.N., SHARON KROLL, R.N., MARY DOE, R.N., JANE DOE, R.N., BETTY DOE, R.N., AND NANCY DOE, R.N., (THE DOE NAMES BEING FICTITIOUS AND UNKNOWN), AND THE VALLEY HOSPITAL, DEFENDANTS.

Argued November 10, 1987—Decided August 11, 1988.

452

*John P. Markey* argued the cause for appellant Richard Doering, M.D. (*Markey, Dailey & Cagney,* attorneys).

*James B. Sharp* argued the cause for appellant Alexandre Ackad, M.D. (*Conway, Reiseman, Mattia & Sharp,* attorneys).

*Peter R. Feehan* argued the cause for appellant Carol Eltridge, R.N. (*Feehan & Feehan*, attorneys).

*William B. Butler* argued the cause for respondent (*Hooley, Butler, DiFrancesco & Kelly*, attorneys).

The opinion of the Court was delivered by

HANDLER, J.

What are we to make of Marilyn Cowan's defenestration? When Ms. Cowan jumped from a second-story hospital room, she was a patient being treated for an overdose of sleeping pills, taken in an earlier suicide attempt that same morning. Her jump from the window left her with serious injuries.

Ms. Cowan came to believe that others, not she, were responsible for her behavior and resultant injuries. She sued her treating physician, Dr. Alexandre Ackad, registered nurses Kathleen Barlics and Carole Eltridge, and the Valley Hospital, alleging that these defendants committed malpractice in not preventing her leap from the room.[1] She also sued Dr. Richard Doering for malpractice, alleging that he negligently prescribed the sleeping pills for her, knowing of her suicidal propensities. Following a trial Ms. Cowan was awarded $600,000 for her permanent injuries.[2]

The defendants' claim that the trial court committed reversible error by refusing to charge the jury that the plaintiff could be considered comparatively negligent was rejected by the Appellate Division. 215 *N.J.Super.* 484 (1987). We granted certification, 107 *N.J.* 634 (1987), to determine whether the

---

[1] Plaintiff's action against Valley Hospital for its negligence (as opposed to that of its individual agents) was not submitted to the jury. Claims against Dr. Levine, her psychiatrist, and three other nurses were dismissed prior to trial, as was a claim by plaintiff's current husband.

[2] The $600,000 award against defendant was apportioned as follows: Dr. Doering, 50%; Dr. Ackad 35%; Nurse Eltridge 10%; Nurse Barlics 5%.

failure to charge the jury on comparative negligence constitutes reversible error.

## I.

The sequence of events that culminated in plaintiff's traumatic injuries began in January 1981 when the plaintiff started working as a registered nurse at Valley Hospital. Shortly thereafter, she met defendant Richard Doering, and in March 1981, began to have a romantic relationship with him. Both were married, but were experiencing difficulties in their respective marriages. Although Doering and Cowan's relationship had sexual aspects, because of Doering's impotency the two did not have intercourse.

On the night of April 10, 1981, depressed over the problems in her marriage and her failure to have a baby, plaintiff ingested seventeen nembutal (sleeping) pills prescribed by her gynecologist. After taking the pills, she telephoned Doering, who detected a slurring in her voice. Doering immediately called back and notified plaintiff's husband, who was home at the time and who rushed plaintiff to Valley Hospital.

Doctors in the emergency room pumped her stomach and she was placed under the care of defendant, Dr. Alexandre Ackad. While in the hospital, Ms. Cowan attempted to disconnect her intravenous (IV) tubes and remove the chest and wrist restraints. Concern over the plaintiff's mental condition led Dr. Ackad to bring in Dr. Alwyn Levine, a psychiatrist, to begin counseling. Dr. Levine concluded that plaintiff was not actively suicidal and hence not committable. Ms. Cowan was released on April 12, but continued to see Dr. Levine twice-a-week on an out-patient basis.[3]

---

[3]Two weeks after her release, plaintiff returned to work at Valley Hospital. But two or three weeks after that, her supervisor asked her to leave, and plaintiff never returned to work there.

Plaintiff continued her relationship with Doering as intensely as before this first suicide attempt. In late May or early June she asked Doering to get her nembutal, complaining that she was having problems sleeping. Dr. Levine had refused to treat the plaintiff with any drugs, believing that she had a potential to overdose. Similarly, Dr. Doering, who was aware of her prior overdose, refused at first. She made two more requests for nembutal in early June. Again, Doering refused. Finally, however, after a fourth request, Doering relented and wrote plaintiff a prescription for nembutal.

On the night of June 23, Doering visited plaintiff at her home while her husband was away. For the first and only time in their relationship, Doering was able to, and did, have intercourse. The parties had different reactions to this occurrence; for the plaintiff their romance had reached its climax, for the defendant its denouement. The next morning, plaintiff called Doering at home. She had believed that the events of the prior evening were significant, increasing her hopes that he would leave his wife, but was depressed after a morning therapy session with Dr. Levine. Ms. Cowan told Doering that she was thinking of moving to her parents' home in Connecticut. To her chagrin, he did not dissuade her, but rather told her that he felt that her leaving might be for the best, and that he would not leave his wife.

After hanging up, plaintiff took all ten of the nembutal pills that Doering had supplied. She then locked all the doors to her house to prevent anyone from coming in, yet also called Doering. From the sound of her voice he feared that she had again overdosed, and immediately called the Ridgewood Police. Again, plaintiff was taken to the emergency ward of Valley Hospital, where she was again placed under the care of Dr. Ackad.

Later in the day Dr. Ackad had plaintiff moved into the Intensive Care Unit (ICU), to an area that was visible from the nurses station. He explained that this was done to monitor the

effects of the pills she had ingested and to enable the nursing staff to watch her more closely. Restraints were placed on her chest and wrists, and she was hooked up to a cardiac monitor and an intravenous feeding tube. She attempted to disconnect her IV tubes and to remove the restraints. The plaintiff was described alternatively as somewhat disoriented and groggy, but also as alert and oriented to time and place. At approximately 10:15 p.m., Dr. Doering visited plaintiff in her room for approximately fifteen minutes. The record does not indicate what was said or what actions were taken at this time. However, when Doering left, he closed the door, contrary to ICU policy. Shortly thereafter, the attending nurse for Cowan in the ICU, defendant Barlics, entered plaintiff's room and discovered that she was not in bed. Barlics called in her supervisor, the charge nurse, defendant Eltridge. They saw that the window was open and then heard moaning from outside. They looked out the window and saw plaintiff lying on the ground, approximately twelve feet below. Plaintiff was taken back into the Emergency Room and treated for her injuries. The nursing staff, which had been trying to reach Dr. Levine during the early evening hours, was finally able to speak directly with him at 11:35 p.m., just one hour after plaintiff jumped from the window. He immediately ordered that a "suicide watch" be instituted for plaintiff Cowan.

Plaintiff suffered permanent injuries. The injuries to her back required the insertion of two steel rods, which limit her movements, make her unable to lift anything over ten pounds, and cause her pain and suffering. These injuries were the basis for her damages claim against defendants.

The plaintiff contended that in several respects the individual defendants were negligent with respect to her care. She contended that Dr. Ackad's failure to order such a "suicide watch" after the June 24th overdose constituted medical malpractice; under a "suicide watch" the plaintiff would receive constant attention that would have prevented her jump. The basis for the malpractice action against nurses Barlics and Eltridge was

their failure properly to monitor her condition and so prevent her jump. Her claim against Dr. Doering was predicated upon his prescribing the nembutal knowing of plaintiff's suicidal tendencies. All defendants attempted to offer proofs of contributory negligence as an affirmative defense.

At trial, the expert witnesses differed over whether plaintiff's suicidal behavior was "genuine" or "manipulative." Plaintiff's expert witness, Dr. Seymour Kuvin, testified that her actions were genuine, that is, that she really wanted to kill herself. But Dr. Ari Kiev, a defense expert witness, testified that the overdosing incidents, although self-destructive acts, were suicide attempts of a very low degree of severity, in that the means used were not irreversible and that plaintiff herself contacted someone who could and did become aware of what she had done. From these circumstances, Dr. Kiev concluded that plaintiff's overdoses and leap from the window were attempts at manipulation—a "dangerous kind of game" designed to extort desired behavior from others.[4]

The evidence established, and the experts agreed, however, that Ms. Cowan had engaged in two suicide attempts, even if they were "of low severity," prior to her jump from the window, and that she was prone to self-damaging acts. Further, the expert psychiatric witnesses agreed that plaintiff suffered from a "borderline personality disorder," characteristics of which include impulsiveness and unpredictability, feelings of emptiness, intense and unstable interpersonal relationships, and physically self-damaging acts. Finally, there was ample evidence that defendants were aware of plaintiff's mental condition and history.

---

[4]The defendants' argument that Ms. Cowan jumped because she simply wanted to leave the building is not significant. To the extent this is suggested by Dr. Doering's remark, it is not inconsistent with plaintiff's personality disorder, which manifested a propensity for self-damaging acts. Defendants' expert did not mention or rely on this testimony, nor was it emphasized by defendants that this remark raised any issue of material fact concerning plaintiff's propensity to commit self-damaging acts.

The trial court, at the close of defendants' case, announced *sua sponte* that it would refuse to instruct the jury on plaintiff's alleged contributory negligence. The court ruled that since "the kinds of acts which [defendants] claim should be considered by the jury for comparative negligence, are those kind of acts which are symptoms of the illness for which she was being treated," contributory negligence as a matter of law should not be charged. The trial court ruled that the jury could consider the volitional nature of plaintiff's acts only in the context of deciding whether proximate cause had been shown.

The Appellate Division affirmed, concluding that the trial court was correct in refusing to give a contributory negligence charge. "Simply stated," the Appellate Division said, "plaintiff committed the very act that defendants were under a duty to prevent." 215 *N.J.Super.* at 495.

## II.

Defendants insist that the Appellate Division and trial court have fashioned a rule in which a mentally disabled plaintiff is relieved from any responsibility for the consequences of his or her own conduct without any requirement that the plaintiff be incapable of exercising self-care. This characterization of the lower courts' holding is inaccurate.

The Appellate Division did not exempt mentally disturbed plaintiffs from the doctrine of contributory negligence. It recognized that the behavior of mentally disturbed plaintiffs should not be measured in light of the objective reasonable person standard, but rather that a mentally disturbed plaintiff's conduct should be measured in light of that plaintiff's mental condition. 215 *N.J.Super.* at 494–95. This relative standard would require that a mentally disturbed plaintiff be held to the degree of care that the plaintiff is capable of exercising. *Id.*

Nevertheless, the Appellate Division ruled that under the circumstances of this case, contributory negligence, in any sense, was not a relevant issue. 215 *N.J.Super.* at 495–96.

The precise basis for this ruling is that in these circumstances the defendants' duty to care for Ms. Cowan included particularly the duty to exercise reasonable care to prevent her from engaging in self-damaging conduct; because it would serve to excuse defendants' own failure to exercise reasonable care, such conduct by the plaintiff could not be the basis of a contributory negligence defense.

Still, according to defendants, the effect of the withdrawal of contributory negligence as an issue in this case was to treat Ms. Cowan as though she were totally incompetent; and because she was not, it was error not to allow the jury to consider whether she was guilty of contributory negligence even under a reduced standard of care.

Contributory negligence of a mentally disturbed plaintiff, though not expressly treated in our decisional law, has been the subject of debate within many jurisdictions. The modern trend appears to favor the use of a capacity-based standard for the contributory negligence of mentally disturbed plaintiffs. W. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser and Keeton on the Law of Torts* § 32, 178 n. 39 (5th ed. 1984). This standard tolerates a reduced standard of care for such persons. It measures the conduct of a mentally disturbed plaintiff in light of his or her capacity. *See, e.g., DeMartini v. Alexander Sanitarium*, 192 *Cal.App.*2d 442, 13 *Cal.Rptr.* 564 (1961); *Emory University v. Lee*, 97 *Ga.App.* 680, 104 *S.E.*2d 234 (1958); *Noel v. McCaig*, 174 *Kan.* 677, 258 *P.*2d 234 (1953); *Mochen v. State*, 43 *A.D.*2d 484, 352 *N.Y.S.*2d 290 (1974); *Feldman v. Howard*, 5 *Ohio App.*2d 65, 214 *N.E.*2d 235 (1966), *rev'd* on other grounds, 10 *Ohio St.*2d 189, 226 *N.E.*2d 564 (1967); *Warner v. Kiowa County Hospital Authority*, 551 *P.*2d 1179 (Okla.App.1976).

This standard is not unlike that adopted by this Court with respect to infant plaintiffs. In *Bush v. New Jersey & New York Transit Co., Inc.*, 30 *N.J.* 345 (1959), the Court held that although there was a rebuttable presumption of incapacity for infants less than seven years old, infant plaintiffs could be

contributorily negligent as a matter of law and their conduct should be measured in light of the infant's capacity to exercise care under all the circumstances. *Id.* at 354–55.

We thus agree with the Appellate Division's explanation of the capacity-based standard. This standard recognizes that a mentally disturbed plaintiff is not capable of adhering to a reasonable person's standard of self-care, but at the same time holds that plaintiff responsible for the consequences of conduct that is unreasonable in light of the plaintiff's capacity. In effect, this rule permits the application of a flexible reduced standard of care; it does not eliminate contributory negligence. Thus, in a case in which an accident involves an apparently negligent plaintiff who is mentally disturbed, contributory negligence is an issue that should be determined under the capacity-based standard. This issue, however, does not present itself in this case because the plaintiff's inability to exercise reasonable self-care attributable to her mental disability was itself subsumed within the duty of care defendants owed to her.

The proposition of law that governs this case is one that excuses a plaintiff from exercising reasonable self-care only when that duty is itself encompassed by the duty of care owed by the defendant to the plaintiff. This legal principle was aptly expressed by this Court, albeit in a different setting, in *Bexiga v. Havir Manufacturing Corp.*, 60 *N.J.* 402 (1972). We there ruled that the contributory negligence defense was unavailable as a matter of law to the manufacturer of a defectively designed industrial tool sued by a worker for injuries caused while using the tool because "[t]he asserted negligence of plaintiff ... was the very eventuality the safety devices were designed to guard against." *Id.* at 412.

■ The question then is whether this proposition of law, that a defendant's duty of care may itself encompass a plaintiff's failure to exercise appropriate self-care and thus obviate the defense of contributory negligence, is an issue supported by the record and fairly posed in this case. There was presented

competent testimony establishing the "standard of practice to which [the respective defendants] failed to adhere." *See Sanzari v. Rosenfeld*, 34 *N.J.* 128, 135 (1961). There was, moreover, expert testimony sufficient to establish that the defendants were under a special duty of care with respect to the particular medical condition of the plaintiff. *See Rosenberg by Rosenberg v. Cahill*, 99 *N.J.* 318, 325 (1985). The trial court's determination that under the evidence the defendants' duty of care as medical professionals could include the duty to prevent a patient from engaging in self-damaging acts, whether or not fairly or accurately characterized as suicide attempts, is well founded. *See* D. Louisell & H. Williams, *Medical Malpractice* § 3.22 (1987); *see also, e.g., Fernandez v. Baruch*, 52 *N.J.* 127, 131–32 (1968) (defendant doctors could have committed malpractice if behavior of patient was such as to put them on notice that patient was likely to attempt suicide); *Meier v. Ross General Hosp.*, 69 *Cal.*2d 420, 445 *P.*2d 519, 522–23, 71 *Cal. Rptr.* 903, 906–07 (1968) (treating physician and hospital liable for patient's suicide because of failure to adequately protect decedent from his own actions); *Pisel v. Stanford Hosp.*, 180 *Conn.* 314, 337–42, 430 *A.*2d 1, 14–15 (1980) (hospital liable for failing properly to observe and monitor patient); *Wilson v. State*, 14 *A.D.*2d 976, 221 *N.Y.S.*2d 354, 355–56 (1961), *app. denied*, 11 *N.Y.*2d 643, 226 *N.Y.S.*2d 1026, 181 *N.E.*2d 461 (1962) (hospital negligent for decedent's injuries and death because it failed to lock door to laundry room chute and failed "to provide adequate supervision in view of decedent's suicidal tendencies.")

We have recognized in a number of contexts that this professional duty of care encompasses, and is shaped by, the plaintiff-patient's medical condition. *See, e.g., Ostrowski v. Azzara*, 111 *N.J.* 429, 444 (1988) (plaintiff's pre-treatment health habits, which may have complicated treatment, are not a bar to recovery because of special responsibility doctors have to diseased patients); *Fosgate v. Corona*, 66 *N.J.* 268, 272–73 (1974) (burden of proof placed on defendant in medical malpractice action

to offer proof that damages are related to pre-existing condition and not alleged malpractice); *see also Berman v. Allan,* 80 *N.J.* 421, 432 (1979) (defendant obstetrician's duty of care for 38 year old woman including giving her the opportunity to undergo amniocentesis). It is but an application of the established principle that the defendant must take the plaintiff as is, reflecting the "intuitive sense of injustice that would excuse negligent conduct inflicted on the particularly susceptible victim." *Ostrowski v. Azzara, supra,* 111 *N.J.* at 438.

This duty of care to prevent self-inflicted harm arises in this case because there was a foreseeable risk that plaintiff's condition, as it was known to defendants, included the danger that she would injure herself. *See Fernandez v. Baruch, supra,* 52 *N.J.* 127; *Meier v. Ross General Hosp., supra,* 69 *Cal.*2d 420, 445 *P.*2d 519, 71 *Cal.Rptr.* 903; *Pisel v. Stamford Hosp., supra,* 180 *Conn.* 314, 430 *A.*2d 1. As health-care professionals, physicians and nurses, the defendants assumed a duty to exercise that degree of care for their patient that would be followed by any reasonable member of the profession under the same circumstances. *See Schueler v. Strelinger,* 43 *N.J.* 330 (1964). This understanding of a medical professional's duty to prevent a patient's self-harm was acknowledged in *Fernandez v. Baruch, supra,* where the Court stated:

> The controlling factors in determining whether there may be a recovery for failure to prevent a suicide is whether the defendants reasonably should have anticipated the danger that the deceased would attempt to harm himself. See Annotation *Civil Liability for Death by Suicide,* 11 *A.L.R.*2d 751, 782–92 (1950) and cases cited therein. [52 *N.J.* at 132.]

*Cf. Hohmann v. Riverlawn Sanatorium,* 103 *N.J.L.* 458 (E. & A. 1927) (defendant sanatorium may not be held liable for death of patient who had escaped and hung himself while committed and under treatment).

Under circumstances similar to those in this case, in which health-care professionals or other caretakers have undertaken to prevent a patient from engaging in suicidal or self-harmful acts, other courts have rejected a charge on contributory negligence to determine liability for the injuries caused by such

self-damaging conduct. In *Psychiatric Institute of Washington v. Allen*, 509 *A*.2d 619 (D.C.App.1986), the appellate court affirmed the trial court's decision to reject defendant mental institution's proposed contributory negligence charge, *id.* at 627 n. 11, where the plaintiff had exhibited suicidal behavior for a number of years, and for which defendant had in fact been treating plaintiff. The court noted that "[t]here was no evidence that [the patient] was capable of exercising reasonable care for his own safety: in fact, all the evidence suggested just the opposite;" *id.;* moreover, the court noted, defendant was on notice of plaintiff's self-damaging behavior and had undertaken the duty to treat plaintiff for this behavior. *Id.* at 623–25.

In *Lomayestewa v. Our Lady of Mercy Hospital*, 589 *S.W.*2d 885 (Ky.1979), the plaintiff was a patient in a psychiatric ward of a hospital; she had a known history of self-damaging acts. She sustained injuries by jumping or falling through a window in her room in the ward. The plaintiff had extricated herself from "Posey restraints" and exited through a window that lacked a detention screen required by state administrative regulation, thus evidencing negligence by the hospital. *Id.* at 886. The Kentucky Supreme Court reversed the trial court's decision to charge on contributory negligence, stating:

> In our view, the very purpose of the statutory regulation would be completely emasculated if the plaintiff's contributory negligence, including the element of assumption of risk, was permitted to defeat his action against a violator of the statutory regulation. It is our conclusion, therefore, that the trial judge erred in submitting the element of causation and contributory negligence to the jury. [*Id.* at 887.]

In *Cole v. Multnomah County*, 39 *Or.App.* 211, 592 *P*.2d 221 (1979), the plaintiff, a prison inmate, sued the county for injuries he suffered as a result of setting his bed on fire. The plaintiff had told prison authorities that he wanted to hurt or kill himself, had asked for implements to do so, and had been behaving in a disturbed manner for approximately one month before the injuries. *Id.* 592 *P*.2d at 222. The plaintiff contended that defendants had a duty to care for him that included

preventing suicide because they knew or should have known of his suicidal tendencies. The court reversed the judgment for defendants, finding that the trial court committed reversible error by submitting the issue of contributory negligence to the jury. *Id.* at 223. The court stated:

> Defendants' allegations of contributory negligence simply restate what plaintiff alleged in his complaint—that he was driven by mental illness to attempt suicide. Under these circumstances, the acts which plaintiff's mental illness allegedly caused him to commit were the very acts which defendants had a duty to prevent, and these same acts cannot, as a matter of law, constitute contributory negligence. (Citations omitted).
>
> If plaintiff were not mentally ill, or if corrections officials were reasonably unaware of any illness, then defendants prevail because they were not negligent, not because plaintiff was contributorily negligent. [*Id.* at 223.]

*See also Vistica v. Presbyterian Hosp. and Medical Center*, 67 *Cal.*2d 465, 432 *P.*2d 193, 62 *Cal.Rptr.* 577, 580 (1967) (where mentally ill patient is "confined for care and treatment in the psychiatric ward of defendant hospital, the duty imposed by law ... extends to safeguarding the patient from dangers due to mental incapacity [including] ... reasonable care to prevent such [self-inflicted] harm (citation omitted) ... and jury was properly instructed that ... she [the patient] was not contributively negligent.").

The testimony presented in this case showed that defendants were aware of the plaintiff's propensity for self-damaging acts; she had a history of such conduct; she had attempted suicide that same morning, and while hospitalized she had ripped off her intravenous tubes and tried to get out of the restraints. As doctors and nurses, the defendants understood plaintiff's personality disorder. Each respectively had a professional responsibility to treat her for this disorder and to treat her for the manifestations or symptoms of the disorder, namely, suicidal or other self-harmful acts. Plaintiff's expert expressed his opinion on the standard of care that was appropriate under these circumstances, that this duty included particularly measures to prevent self-injury, and that this duty had been breached by defendants. He testified that Ms. Cowan had exhibited behavior that required much closer observations and monitoring by

defendants Ackad, Eltridge, and Barlics, and further indicated that Doering's prescription of the nembutal was contrary to proper medical practice.

Although this evidence was challenged by defendants, it fully supported the jury's finding that defendants' conduct constituted professional negligence or malpractice. Based on the facts presented the jury could have found that Dr. Ackad did not order sufficient monitoring or arrange for adequate restraints, and acted unreasonably in light of his knowledge of her mental condition and history of self-inflicted injury, and similarly, that nurses Barlics and Eltridge failed to observe Ms. Cowan sufficiently or to monitor her condition properly. With respect to Dr. Doering, the jury could determine that he unreasonably created or enhanced the risk of self-inflicted injury when he prescribed nembutal in light of his actual knowledge of plaintiff's suicidal propensities and actual prior suicidal experiences.

Moreover, even though plaintiff's conduct had no relevance in terms of her fault or contributory negligence, the evidence submitted concerning her conduct was considered by the jury as it related to defendant's ultimate responsibility, through the concept of proximate cause. The trial court instructed the jury that the defendants' negligence or malpractice would not give rise to liability for plaintiff's injuries if the jury found that plaintiff's leap from the window constituted an intervening cause that broke the chain of causation linking defendants' conduct to plaintiff's injury, as it might if her act were volitional and not attributable to her disorder or condition. Thus, in this case "the distinction ... between foreseeability as it impacts on duty determination and foreseeability as it is sometimes applied to proximate cause—a critical distinction too often (because too easily) overlooked," was preserved. *Hill v. Yaskin*, 75 *N.J.* 139, 143 (1977).

The issue fairly presented to the jury was whether the leap was reasonably foreseeable or was, on the contrary, a remote or abnormal incident of the risk of self-injury that was not otherwise reasonably foreseeable by defendants. *See Rappa-*

*port v. Nichols,* 31 *N.J.* 188, 203–04 (1959) (intervening cause must not be foreseeable or a normal incident of risk created by defendant's conduct to relieve defendant of liability). The resolution of the subtle and elusive issue of proximate cause is perhaps the most critical determination bearing on the fairness of imposing liability on an otherwise negligent defendant. *See Ostrowski v. Azzara, supra,* 111 *N.J.* at 443. Proximate cause serves to apportion responsibility for wrongful injury in accordance with "fairness and sound public policy." *Brown v. Stove Co.,* 98 *N.J.* 155, 173 (1984). Thus the jury was allowed to consider the plaintiff's conduct, including her inability to exercise reasonable care, within the parameters of proximate causation. Because it was clearly foreseeable that defendants' conduct created a risk that plaintiff would engage in self-damaging acts, the jury's rejection of the intervening causation was fully supported by the evidence.

We are satisfied in this case that no legitimate concerns of public policy are disserved by the removal of the issue of contributory negligence with respect to a mentally-disturbed but not totally incompetent plaintiff in the context of this case. The plaintiff's inability adequately to control her self-damaging behavior—which indeed was symptomatic of her mental disturbance—was known to the defendants, and the defendants were under a duty to prevent plaintiff's self-damaging acts. Thus, because defendants' duty of care was co-extensive with the plaintiff's ability to avoid self-damaging acts, the withdrawal of contributory or comparative negligence supports the policy that undergirds our "fault-based" system of tort law, particularly the discouragement of unreasonable conduct, is not undermined. *See, e.g., Weinberg v. Dinger,* 106 *N.J.* 469, 494–95 (1987) (eliminating immunity for private water companies because duty to exercise reasonable care in supplying water to fight fires will deter unreasonable conduct); *People Express v. Conrail,* 100 *N.J.* 246, 255 (1985) (imposing tort damages for purely economic losses because this will deter future similar tortious conduct).

The improper or inappropriate imposition of the defense of contributory negligence can lead to the dilution or diminution of a duty of care. *See, e.g., Soronen v. Olde Milford Inn, Inc.,* 46 *N.J.* 582, 589–92 (1966); *Thompson v. Victor's Liquor Store, Inc.,* 216 *N.J.Super.* 202, 211–12 (App.Div.1987); *see also Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* 150, 158 (1979) (ordinary contributory negligence is not available as a defense in a products liability case when plaintiff's conduct directly relates to manufacturing defect that causes accidental injury). Because the improper application of contributory negligence can prevent any recovery for tortious injury and enable a tortfeasor to escape liability, it can indirectly lessen responsibility for wrongful conduct and defeat the goals of tort law. As this Court observed in *Bexiga, supra,* 60 *N.J.* at 412, in rejecting the application of contributory negligence: "It would be anomalous to hold that defendant has a duty to install safety devices but a breach of that duty results in no liability for the very injury the duty was meant to protect against." This consideration is particularly important in the health-care field. *See Hunt v. King County,* 4 *Wash.App.* 14, 21–22, 481 *P.2d* 593, 598 (1971) (when hospital's duty to care for patient includes duty to prevent self-damaging acts the act itself cannot be diluted by relieving defendant of responsibility by treating act as superseding or intervening cause); *Vistica v. Presbyterian Hosp. and Medical Center, supra,* 67 *Cal.*2d 465, 432 *P.*2d 193, 62 *Cal.Rptr.* 577, 580 (reversing judgment for defendants because charge could have diluted defendants' duty). Application of contributory negligence in these circumstances would, as the Appellate Division here noted, 215 *N.J.Super.* at 495, "render meaningless the duty of the hospital to protect the patient against self-inflicted harm."

### III.

In sum, the evidence adduced below established that plaintiff was mentally-disturbed and that suicidal tendencies or a pro-

pensity for self-harm were symptomatic of her condition. The evidence further demonstrated that as health-care professionals, defendants were aware of her condition, their duty was to prevent self-damaging actions by the plaintiff, and that defendants breached that duty of care, causing the injuries to plaintiff. The defendants challenged the scope of their duty and the claimed malpractice, using expert testimony to indicate that the plaintiff was not genuinely suicidal and not a serious risk and that their treatment was proper. It was this question—whether the defendants' duty of care was breached when plaintiff injured herself—that constituted the central issue to be decided below. Because this duty of care included the prevention of the kind of self-damaging acts that caused plaintiff's injuries, the plaintiff's actions and capacity were subsumed within the defendants' scope of duty. Thus, the trial court correctly ruled that the defense of contributory negligence was not available.

Accordingly, the judgment of the Appellate Division is affirmed.

CLIFFORD, J., dissenting.

This appeal presents the single issue of whether the trial court erred in refusing to instruct the jury on contributory negligence. The Appellate Division held that because plaintiff committed the very act that defendants were under a duty to prevent, she could not, as a matter of law, be guilty of contributory negligence. "Plaintiff's willful destructive propensities were plainly part and parcel of the mental illness from which she suffered. A triable factual question was not presented in that regard." *Cowan v. Doering*, 215 *N.J.Super.* 484, 496 (1987). The Court agrees: "Because [defendants'] duty of care included the prevention of [plaintiff's] self-damaging acts, the plaintiff's actions and capacity were subsumed within the defendants' scope of duty. Thus, the trial court correctly ruled that the defense of contributory negligence was not available." *Ante* at 468.

To the extent that I understand the foregoing, I disagree with it. The jury could well have found from defendants' psychiatric testimony that plaintiff's conduct was a calculated, manipulative gesture rather than a genuinely suicidal act. This is borne out by the unobjected-to testimony of defendant Doering that all plaintiff was trying to do at the time of her fall was get out of the hospital.

[H]er comment to me * * * was that she wanted to leave the hospital. She did not want to hurt herself.

In addition, there were unobjected-to questions by counsel, the record support for which is concededly obscure, that incorporated expressions such as "lowered herself out" of the window and "dropped out" from a level that was twelve feet above a surface the composition of which is not disclosed by the record. So there were facts in the record that lend support to the theory, far-fetched to be sure, that plaintiff was doing no more than pursuing an unorthodox method of departure.

The point is that one version of the facts surrounding plaintiff's fall, coupled with evidence that plaintiff was sufficiently competent to appreciate the risk (her statement to Doering about her intentions and her manner of departure suggest that she did indeed appreciate the risk), supports the proposition that contributory negligence should have stayed in the case as a defense. Plaintiff had some responsibility for her own well-being, even if it was to exercise only that degree of care that a person in her condition was capable of exercising.

Until the trial court on its own motion took contributory negligence out of the case, plaintiff's counsel apparently assumed, along with everyone else except the judge, that it was a legitimate issue. Because I believe that defendants should not have been deprived of the opportunity to have the jury consider that issue, I would reverse and remand.

POLLOCK, J., joins in this opinion.

*For affirmance*—Chief Justice WILENTZ and Justices HANDLER, O'HERN, GARIBALDI and STEIN–5.

*For reversal and remandment*—Justices CLIFFORD and POLLOCK–2.