Thomas G. JAKELSKY, Plaintiff,

v.

Jane S. FRIEHLING, D.O., Defendant.

No. CIV. A. 97–1358.

United States District Court,
D. New Jersey.

Jan. 26, 1999.

Peter D. Hoffman, Thomas Ghignone, Law Office of Peter D. Hoffman, Frenchtown, NJ, for Plaintiff, Thomas G. Jakelsky.

Timothy M. Crammer, Paarz, Master, Koernig, Crammer, O'Brien, Bishop & Horn, P.C., Pleasantville, NJ, for Defendant, Jane S. Friehling, D.O.

## OPINION

ORLOFSKY, District Judge.

On the morning of trial, Defendant, Dr. Jane S. Friehling ("Dr.Friehling"), moved for summary judgment on the medical malpractice claims alleged by Plaintiff, Thomas G. Jakelsky ("Jakelsky"). The resolution of this motion requires this Court to penetrate the fog engendered by the elusive legal doctrine known as "proximate cause." Indeed, the

---

1. Rule 702 of the Federal Rules of Evidence provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702.

2. Jakelsky also filed a cross-motion, arguing that, under the standard announced by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals,*

facts of this case present what would be an utter nightmare for a first year law student taking his or her final exam in torts.

In her motion for summary judgment, Dr. Friehling argues that this Court should grant judgment as a matter of law against Jakelsky, because Jakelsky's medical expert, Dr. Michael L. Schilsky, did not reach his conclusions with a reasonable degree of medical certainty, and because he cannot testify that any alleged acts of malpractice by Dr. Friehling caused Jakelsky's alleged injuries. *See* Brief in Support of Jane S. Friehling, D.O.'s Motion for Summary Judgment, filed January 25, 1999, at 8–18. Essentially, Dr. Friehling argues that Jakelsky's alleged injuries relating to his employment and automobile accident are not the foreseeable results of, and thus not proximately caused by, any of the three acts of medical malpractice that Jakelsky alleges Dr. Friehling committed, which are: (1) failing to diagnose Jakelsky's Wilson's Disease in a timely manner; (2) providing Jakelsky with a release to return to work on July 7, 1995, when Jakelsky was not emotionally ready to return; and (3) abandoning Jakelsky as a patient on July 7, 1995.

In response, Jakelsky argues that the Federal Rules of Evidence, namely Rule 702,[1] and federal case law, most particularly *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), apply in this case, which merely require that an expert provide reliable and relevant testimony that will assist the trier of fact with scientific evidence which is beyond the ken of the average layperson. According to Jakelsky, under this standard, Dr. Schilsky's testimony is reliable, relevant and, thus, admissible.[2] This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1367.

509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the testimony of Dr. William H. Lipshutz, Dr. Friehling's medical expert, is inadmissible. During oral argument yesterday, January 25, 1999, I denied this motion, holding that Dr. Lipshutz was qualified to provide the proffered testimony, and that Jakelsky's challenges to the qualifications of Dr. Lipshutz to offer an opinion affected the weight, but not the admissibility of his opinion.

In addition to Dr. Friehling's motion for summary judgment, during discussions with counsel yesterday morning prior to jury selection, I requested that Jakelsky provide me with a copy of the Settlement Agreement and Release, entered into between Jakelsky and Defendants, Siemens Business Communications Systems, Inc., Richard Pagano, John Deex, Eric Hall'eus, Charles Hess, Mario D'Agostino, Thomas Kelly, and Dorothy Sharp (collectively, "Siemens"), to determine whether Jakelsky has already recovered for the claims relating to his alleged workplace injuries that he now asserts against Dr. Friehling.

To determine if recovery is duplicative, I must first consider whether Jakelsky has asserted claims against Dr. Friehling for the same injuries that he claimed Siemens caused. If I find that Jakelsky has, in fact, alleged claims for the same injuries, then I must determine whether Dr. Friehling and Siemens are joint tortfeasors, because if Dr. Friehling is a joint tortfeasor, then, under New Jersey law, she is permitted to present evidence at trial that Jakelsky has already received full satisfaction of his damages. Thus, to the extent that Jakelsky has already recovered from Siemens, he may not also recover from Dr. Friehling.

For the reasons set forth below, I find that no reasonable jury could determine that the fatal car crash was a foreseeable result of any of Dr. Friehling's alleged acts of medical malpractice. In addition, I hold that no reasonable jury could find that Dr. Friehling's alleged medical malpractice that resulted in a delay in the diagnosis of Jakelsky's Wilson's Disease caused any damages to accrue after Dr. Friehling diagnosed Jakelsky's condition on April 7, 1995. Finally, I find that there is no evidence in the summary judgment record to suggest that Dr. Friehling's alleged abandonment of Jakelsky had any effect on the events that occurred in Jakelsky's life through July 13, 1995, the last day he claims any injuries. As a result, I hold that the alleged abandonment could not have proximately caused any of the injuries that Jakelsky alleges he sustained. Accordingly, I will grant Dr. Friehling's motion for summary judgment with respect to: (1) Jakelsky's

claims of injury as a result of the car accident; (2) all claims of injury that accrued after April 7, 1995, which allegedly resulted from any delay in Dr. Friehling's diagnosis of Jakelsky's Wilson's Disease; (3) all claims of injury that accrued before July 7, 1995, which allegedly resulted from Dr. Friehling's decision to provide Jakelsky with a release to return to work; and (4) all claims of injury allegedly resulting from Dr. Friehling's alleged abandonment of Jakelsky as a patient.

With respect to the Settlement and Release entered into between Jakelsky and Siemens, I find that Siemens could only be held liable for any damages that accrued after it had notice that Jakelsky had Wilson's Disease on April 7, 1995. As a result, Dr. Friehling is solely liable for all damages, if any, that accrued from the date of her first consultation with Jakelsky on February 25, 1994, until April 7, 1995, the date on which she diagnosed Jakelsky's condition as Wilson's Disease and Jakelsky informed Siemens of this diagnosis. After April 7, 1995, Siemens may be held liable, and after July 7, 1995, Dr. Friehling may again be held liable, for Jakelsky's alleged workplace injuries, if the jury concludes that they result from any acts of alleged negligence. Thus, for all damages, if any, that the jury may award Jakelsky for injuries accruing after July 7, 1995, Dr. Friehling will have the opportunity to prove that Jakelsky has already received full satisfaction from his settlement with Siemens.

## I. BACKGROUND

On February 25, 1994, Jakelsky first consulted with Dr. Friehling, a gastroenterologist, complaining of digestive problems, headaches, and emotional distress. *See* Memorandum in Support of Plaintiff's Cross–Motion to Disqualify Defendant's Expert and in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Opposition"), filed Jan. 25, 1999, Ex. 3 (Letter from Dr. Friehling to Dr. Neuman, dated Feb. 25, 1995). For the next approximately thirteen months, until April 7, 1995, Jakelsky continued to see Dr. Friehling to ascertain the cause of his difficulties. *See id.*, Exs. 3–10 (Letters from Dr. Friehling reporting on

Jakelsky's continued medical care under her supervision); Amended Complaint ¶¶ 28–33. His condition remained undiagnosed for those months, until Jakelsky mentioned that his sister had been diagnosed with Wilson's Disease. *See* Amended Complaint ¶ 33. After learning that Jakelsky's sister had been diagnosed with Wilson's Disease, a rare genetic disorder that affects one in thirty thousand people worldwide, Dr. Friehling ordered tests to confirm that Jakelsky did, in fact, have Wilson's Disease. *See* Plaintiff's Opposition, Ex. 8 (Letter from Dr. Friehling to Dr. Tan, dated Apr. 7, 1995, noting that she ordered tests to check Jakelsky's serum ceruloplasmin level and to check for Kayser–Fleischer rings in his "eyegrounds").

Ultimately, on April 7, 1995, Dr. Friehling told Jakelsky that he had Wilson's Disease. *See id.* Jakelsky immediately informed his employer, Siemens Rolm Communications Company,[3] that he had Wilson's Disease, and explained that the disease can cause behavioral problems. *See* Amended Complaint ¶ 37.

In May, 1995, Jakelsky took a medical leave of absence to undergo a six-week period of treatment for Wilson's Disease at the University of Michigan, under the care of Dr. George Brewer. *See* Joint Final Pretrial Order ("JFPO"), filed Oct. 21, 1998, at Part II, ¶ 1. On July 2, 1995, upon the completion of this course of treatment, Dr. Brewer released Jakelsky, determining that his symptoms from Wilson's Disease were completely under control, and that he was ready to return to work. *See* Plaintiff's Opposition, Ex. 14 (Medical log from Siemens, noting that on July 5, 1995, "received fax from [treatment] facility in MI. Dr. Brewer indicates [Jakelsky] on maintainance [sic] [treatment] for copper toxicity, controlled and eligible for [return]"). Dr. Brewer sent a letter permitting Jakelsky's return to work on July 5, 1995, which stated:

Thomas Jakelsky is under my care for the management and treatment of his Wil-

son's Disease. This disease is an inherited disorder in which too much copper accumulates in the body. The sickness which develops may involve the liver or the brain or both. Fortunately, this is a disease which can be treated. Copper accumulation can be prevented by taking an anti-copper medication such as zinc.

Thomas takes 50 milligrams of zinc acetate salt three times a day. As long as he takes this medication properly, further copper accumulation will be prevented and this disease will not progress. His Wilson's Disease is well controlled and is expected to remain that way. He's expected to live a normal lifetime free of any side effects. If you have any questions, just call.

Friehling Dep. Tr. at 81–82.

When Jakelsky attempted to return to work on July 5, 1995, Siemens informed him that he must provide the company with a release from Dr. Friehling before he could return to work. *See* JFPO at Part III.A. On July 5, 1995, Jakelsky obtained a note from Dr. Friehling, signed by a receptionist in her office, releasing Jakelsky to return to work. *See* Friehling Dep. Tr. at 76. Dr. Friehling did not examine Jakelsky before providing this release. *See id.* Two days later, Dr. Friehling examined Jakelsky, *see* Schilsky Dep. Tr. at 94, and read the July 5, 1995, letter from Dr. Brewer. *See* Friehling Dep. Tr. at 83. From her examination, Dr. Friehling concluded that:

It certainly appears the effects of the disease have been totally reversible and clinically [Jakelsky] is doing fine emotionally. In the office he seems somewhat labile and somewhat anxious but claims to be just full of energy and very pleased to be back home. He is very anxious to start work once again.

Plaintiff's Opposition, Ex. 17 (Letter from Dr. Friehling to Dr. Patrognoni, dated July 7, 1995). Based on this conclusion, she

---

**3.** In his complaint, Jakelsky alleges claims against Siemens under the Americans with Disabilities Act, the New Jersey Law Against Discrimination, and for intentional and negligent infliction of emotional distress, breach of a medical confidentiality agreement, and medical mal-

practice. In December, 1998, Jakelsky settled all of these claims with Siemens, releasing them entirely from this litigation. I discuss below whether this settlement provides Jakelsky with compensation for some of the claims Jakelsky now asserts against Dr. Friehling.

signed a second release on July 7, 1995, permitting Jakelsky to return to work. *See id.*, Ex. 16. On July 7, 1995, Dr. Friehling also determined that she "[did] not see any reason ... to follow Tom [Jakelsky] any further in the office. He will be followed by Dr. Brewer at the University of Michigan and then will see [his primary care physician locally] for further care." *Id.*, Ex. 17. Nonetheless, she also noted in the same letter that "[i]f any other GI problems develop in the future, [she] would be happy to see [Jakelsky] back again in the office." *Id.*

Jakelsky went to work on July 13, 1995, however, he had substantial difficulties and was forced to take a short-term disability leave by his employer. *See* JFPO at Part III.B. After Siemens commanded him to leave the premises, Jakelsky drove away from the Siemens premises in his automobile. Just seconds later, Jakelsky struck and severely injured David Logar, a pedestrian.[4] *See id.*

Jakelsky now alleges that Dr. Friehling committed three acts of medical malpractice. First, he contends that Dr. Friehling failed to diagnose him as suffering from Wilson's Disease in a timely manner. *See* JFPO at Part III.B. Second, Jakelsky alleges that Dr. Friehling acted negligently when she concluded that he could return to work, despite noting that he seemed "anxious" and "labile." *See id.* Third, Jakelsky alleges that Dr. Friehling abandoned him as a patient. *See id.* Jakelsky alleges "[t]hat the combination of. Defendant Dr. Friehling's failure to diagnose Plaintiff Jakelsky's Wilson's Disease, conduct a full examination of Plaintiff Jakelsky when rendering a full release to work, and abandoning Plaintiff Jakelsky, caused severe employment consequences and a fatal automobile accident." *Id.*

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Reitz v. County of Bucks*, 125 F.3d 139, 143 (3d Cir.1997); *Hersh v. Allen Prod. Co.*, 789 F.2d 230, 232 (3d Cir.1986). In deciding whether there is a disputed issue of material fact, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *See, e.g., Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995); *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir.1987).

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the non-moving party has provided evidence to show that a question of material fact remains. Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion ...; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)); *see also Lujan v. National Wildlife Fed.*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("The object of [Rule 56(e) ] is not to replace conclusory allegations

---

4. David Logar filed a complaint in state court, seeking to recover damages for injuries allegedly caused by this accident. *See David Logar, et al. v. Siemens–Rolm Communications, et al.*, Docket No. L–01792–97, Superior Court of New Jersey, Camden County, Law Division. Sadly, Logar died in January, 1998, at the age of 22.

of the complaint ... with conclusory allegations of an affidavit."); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992) ("[T]o raise a genuine issue of material fact ... the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather must exceed the " 'mere scintilla' threshold."), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). If the non-moving party fails to oppose the motion by written objection, memorandum, affidavits and other evidence, the Court "will accept as true all material facts set forth by the moving party with appropriate record support." *Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.,* 922 F.2d 168, 175 (3d Cir.1990) (quoting *Jaroma v. Massey,* 873 F.2d 17, 21 (1st Cir.1989)).

Even where the non-moving party has failed to establish a triable issue of fact, summary judgment will not be granted unless "appropriate." Fed.R.Civ.P. 56(e); *see Anchorage Assocs.,* 922 F.2d at 175. Rule 56(e) of the Federal Rules of Civil Procedure requires that the case be evaluated on its merits, with summary judgment being granted for the movant only if they are entitled to a judgment as a matter of law. *See Anchorage Assocs.,* 922 F.2d at 175.

### III. DISCUSSION

Dr. Friehling argues that all of Jakelsky's employment-related claims, as well as those arising out of the automobile accident must be dismissed, because: (1) as a matter of law, Dr. Friehling's alleged malpractice did not proximately cause these damages; or (2) Dr. Schilsky, Jakelsky's expert, cannot say with a reasonable degree of medical certainty that Dr. Friehling's alleged malpractice proximately caused these damages. Essentially, Dr. Friehling contends that none of the alleged acts of malpractice that Jakelsky claims Dr. Friehling committed proximately or foreseeably caused Jakelsky's alleged injuries.

### A. Proximate Cause

▮ "The resolution of the subtle and elusive issue of proximate cause is perhaps the most critical determination bearing on the fairness of imposing liability on an otherwise negligent defendant." *Cowan v. Doering,* 111 N.J. 451, 466, 545 A.2d 159 (1988). The proximate cause inquiry asks "whether the [injury] was reasonably foreseeable or was, on the contrary, a remote or abnormal incident ... that was not otherwise reasonably foreseeable by defendant[ ]." *Id.* at 465, 545 A.2d 159. "The tortfeasor need not foresee the precise injury; it is enough that the type of injury be within an objective 'realm of foreseeability.' " *Arvanitis v. Hios,* 307 N.J.Super. 577, 585, 705 A.2d 355 (N.J.Super.App.Div.1998) (quoting *Yun v. Ford Motor Co.* ("*Yun I*"), 276 N.J.Super. 142, 647 A.2d 841 (N.J.Super.App.Div.1994)) (citations omitted in original). " 'Foreseeability means that which it is objectively reasonable to expect, not merely, what might conceivably occur.' " *Yun v. Ford Motor Co.* ("*Yun II*"), 143 N.J. 162, 166, 669 A.2d 1378 (1996) (Garibaldi, J., dissenting) (quoting *Peck v. Ford Motor Co.,* 603 F.2d 1240. 1246 (7th Cir. 1979)). "Thus, '[t]he actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm.' " *Arvanitis,* 307 N.J.Super. at 585, 705 A.2d 355 (quoting Restatement (Second) of Torts § 435(2) (1965)) (alteration in original). "Assigning liability for harm that fortuitously extends beyond the foreseeable risk of the negligent conduct unfairly punishes the tortfeasor for harm that he could not have anticipated and take precautions to avoid." *People Express Airlines, Inc. v. Consolidated Rail Corp.,* 100 N.J. 246, 266, 495 A.2d 107 (1985).

*Jensen v. Schooley's Mountain Inn* provides an instructive example of the limits of proximate cause and foreseeability. *See Jensen v. Schooley's Mountain Inn, Inc.,* 216 N.J.Super. 79, 82, 522 A.2d 1043, (N.J.Super.App.Div.), *certif. denied,* 108 N.J. 181, 528 A.2d 11 (1987). In that case, the Appellate Division of the New Jersey Superior Court concluded that serving alcohol to a visibly intoxicated patron did not proximately cause injuries sustained when the patron subsequently drove his car eight miles,

parked, climbed a tree, fell out of the tree, rolled into the river and drowned. *See id.*

■■■ "Ordinarily questions of proximate cause are left to the jury for its factual determination," *Yun I*, 276 N.J.Super. at 160, 647 A.2d 841 (Gaibaldi, J., dissenting), however "[w]here the outcome is clear, there is no reason to put the parties or the court to the burden of a[ ]trial." *Rena, Inc. v. T.W. Brien*, 310 N.J.Super. 304, 332, 708 A.2d 747 (N.J.Super.App.Div.1998). "Proximate cause will be decided as a matter of law when 'highly extraordinary events or conduct tak[e] place.'" *Yun II*, 143 N.J. at 163, 669 A.2d 1378. Thus, if I find that no reasonable jury could conclude that Jakelsky's claimed damages were a foreseeable result of Dr. Friehling's alleged negligence, then I must grant summary judgment. *See id.* ("When injuries resulting from negligence are not foreseeable, there can be no finding of proximate cause.").

### B. The Three Acts of Alleged Malpractice

For the sake of clarity, I will consider Dr. Friehling's motion for summary judgment separately with respect to each alleged act of malpractice.

### 1. Alleged Delay in Diagnosis

■■■Jakelsky has asserted a claim of medical malpractice against Dr. Friehling, alleging that her failure to diagnose his Wilson's Disease in a timely manner caused physical and emotional damages, and, in some way contributed to the automobile accident on July 13, 1995, that involved Jakelsky and David Logar. Dr. Friehling argues that Dr. Schilsky cannot testify with a reasonable degree of medical certainty that Dr. Friehling's alleged failure to diagnose Jakelsky more timely caused the car accident. I find, as a matter of law and of logic, that no one could testify that Dr. Friehling's alleged failure to diagnose Jakelsky in a timely manner caused the automobile accident. More specifically, once Dr. Friehling did diagnose Jakelsky as suffering from Wilson's Disease, any damages caused by the failure to do so in a timely manner ceased to accrue. Once Jakelsky knew that he had Wilson's Disease and

informed Siemens of his condition, both Jakelsky and Siemens were able to take any actions necessary to remedy or prevent any future injuries. Thus, upon diagnosis, any injuries that Jakelsky suffered because he did not know that he had Wilson's Disease, and could not so inform his employer, ceased to accrue. In other words, Dr. Friehling's alleged failure to diagnose Jakelsky with Wilson's Disease in a timely manner cannot possibly have proximately caused any injuries that accrued after a diagnosis was provided.

■■■ By contrast, if Jakelsky can prove at trial that Dr. Friehling was negligent, then he will have the opportunity to demonstrate that the delay in diagnosing his condition caused any of his injuries that accrued from February 25, 1994, the time that Jakelsky first consulted with Dr. Friehling, until April 7, 1995, the day on which Dr. Friehling diagnosed Jakelsky with Wilson's Disease. Accordingly, I will grant Dr. Friehling's motion for summary judgment with respect to all of Jakelsky's allegations that he suffered injuries after April 7, 1995, resulting from Dr. Friehling's delay in diagnosing Jakelsky's condition.

■■■ This conclusion also resolves, in part, the issue of Jakelsky's settlement with Siemens with respect to any damages that may have resulted from Dr. Friehling's alleged delay in providing a diagnosis. Before Dr. Friehling informed Jakelsky that he had Wilson's Disease on April 7, 1995, both Jakelsky and Siemens were unaware of Jakelsky's medical disability. As a result, neither Jakelsky nor Siemens could have taken any steps to prevent or remedy any of the workplace difficulties that Jakelsky experienced before April 7, 1995. Thus, Dr. Friehling is solely liable for any injuries accruing before April 7, 1995, which Jakelsky can prove resulted from her alleged failure to diagnose him with Wilson's Disease in a timely manner.

Because Siemens did not, and could not, know that Jakelsky had Wilson's Disease during the period from February 25, 1994, to April 7, 1995, it cannot be held liable as a joint tortfeasor for this time period. Accordingly, I find that the Settlement and Release

entered into between Siemens and Jakelsky only released those claims that accrued after April 7, 1995, when Siemens was on notice that Jakelsky had Wilson's Disease. The Settlement Agreement and Release, therefore, do not preclude Jakelsky from recovering for any damages that accrued before April 7, 1995, which could only have resulted from Dr. Friehling's alleged failure to diagnose Jakelsky with Wilson's Disease in a timely manner.

### 2. Releasing Jakelsky to Return to Work

 Jakelsky alleges that Dr. Friehling negligently released him to return to work on July 7, 1995, which resulted in "severe employment consequences and a fatal automobile accident." JFPO at Part III.B. In her motion for summary judgment, Dr. Friehling argues that these damages were not a foreseeable result of this alleged malpractice. *See* Brief in Support of Jane S. Friehling, D.O.'s Motion for Summary Judgment, filed January 25, 1999, at 14. I agree.

As I stated above, the plaintiff must demonstrate that this type of injury was a reasonably foreseeable result of the alleged negligent act. In this case, it is reasonably foreseeable that sending an emotionally unstable person to work could cause tension and work-related problems. *See* Schilsky Dep. Tr. at 115–16 (explaining that the only problem with Dr. Friehling's July 7, 1995, release was "that she had a question about [Jakelsky's] emotional state"); *see also Cowan v. Doering*, 111 N.J. 451, 462, 545 A.2d 159 (1988) (holding that "there was a foreseeable risk that plaintiff's [suicidal] condition, as it was known to defendants, included the danger that she would injure herself"). Dr. Friehling should, or did, know that Wilson's Disease caused emotional problems. Even the most basic literature about Wilson's Disease would have informed Dr. Friehling that the disease commonly causes "psychiatric, or neurologic symptoms," including "depression and aggression." *See, e.g.*, Wilson's Disease Ass'n ·Int'l, *About Wilson's Disease* (visited January 21, 1999) <*http://www.wilsonsdisease.org/aboutwilsons.html*>. ·From this knowledge, Dr. Friehling could have easily predicted that Jakelsky would suffer negative consequences in the workplace, should he return while exhibiting psychiatric symptoms of Wilson's Disease.

By contrast, it is "highly extraordinary", *see Arvanitis v. Hios*, 307 N.J.Super. 577, 585–85, 705 A.2d 355 (1998) (quoting Restatement (Second) of Torts § 435(2) (1965)), to imagine that solely as a result of emotional distress, a person would have an automobile accident. In other words, a reasonable person could not predict that permitting an emotionally unstable person to return to work would lead to a fatal car accident. Moreover, even if Dr. Friehling had recommended that Jakelsky not return to work, she would not likely have recommended that Jakelsky refrain from driving simply because he seemed "anxious" and "labile." Indeed, she did not so recommend, nor did she impose any restrictions on his activities. Thus, even assuming that Dr. Friehling was negligent in sending Jakelsky back to work on July 7, 1995, I find that it is not foreseeable that this decision would lead to a fatal car crash.

 Furthermore, Dr. Schilsky cannot even say that Dr. Friehling's alleged negligence caused the car accident. Dr. Schilsky testified in his deposition, that at best, he could conclude that "there was damage to Mr. Jakelsky. And damage to Mr. Jakelsky could be one of the events that had led to the automobile accident[, but I] don't know for certain that ... it did." Schilsky Dep. Tr. at 262. Dr. Schilsky opined that Dr. Friehling's alleged negligence caused the car accident, because:

> [I]t's the old if you go back and you change a chain in time do you cause a series of events to change months and months later. And sometimes we never know the answer. It's like Albert Finley's books with time travel with reference to changing events, do we know what the event that is changed will subsequently lead to.

*Id.* at 256. Proximate cause, however, does not permit the Court, or the jury, to go back in time with the hindsight of a time traveler. *See Yun v. Ford Motor Co.*, 143 N.J. 162, 165, 669 A.2d 1378 (1996) (" 'In a sense, in retrospect almost nothing is entirely unforeseeable.' ") (quoting *Peck v. Ford Motor Co.*,

603 F.2d 1240, 1246 (7th Cir.1979)). Considering the circumstances of this case, unaided by the wisdom and vision of a time traveler, I find that Dr. Friehling's alleged medical malpractice could not have foreseeably or proximately caused Jakelsky's automobile accident. As a result, I will grant Dr. Friehling's motion for summary judgment with respect to all claims relating to the automobile accident. I will deny the motion, however, with respect to workplace injuries that may have resulted from Dr. Friehling's alleged negligence in sending Jakelsky back to work on July 7, 1995. To state the obvious, in an effort to prevent any confusion at trial, Jakelsky may only claim at trial that Dr. Friehling's alleged negligence in sending him back to work on July 7, 1995, caused injuries on July 7, 1995, or after. It would be illogical for Jakelsky to claim that he was injured by any alleged medical malpractice before it occurred. Therefore, consistent with my previous holding regarding Dr. Friehling's alleged delay in diagnosing Jakelsky with Wilson's Disease, I hold that Jakelsky can attempt to recover for work-related injuries, if any, that accrued from February 25, 1994 until April 7, 1995, and those injuries, if any, that accrued from July 7, 1995 until July 13, 1995, inclusive.

 This holding requires that I further consider the effect of the Settlement and Release entered into by Jakelsky and Siemens, because both Siemens and Dr. Friehling may have been liable for work-related injuries that accrued in the period from July 7, 1995, to July 13, 1995.

 Under New Jersey law, a plaintiff may " 'pursue all those who are independently liable to him for his harm until one full satisfaction is obtained.' " *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 186 (3d Cir.1992) (quoting *McFadden v. Turner,* 159 N.J.Super. 360, 367, 388 A.2d 244 (N.J.Super.App.Div.1978)). Whether a plaintiff has been fully compensated by a settlement "must await determination at trial during which relevant oral as well as documentary evidence may be admitted." *Breen v. Peck,* 28 N.J. 351, 367, 146 A.2d 665 (1958). "The defendant[ ] bear[s] the burden of proving that the release was intended

to serve as full compensation." *Township of Wayne v. Messercola,* 789 F.Supp. 1305, 1312 (D.N.J.1992) (Lechner, J.) (under New Jersey state law). Accordingly, Dr. Friehling will have the opportunity to present evidence at trial that Jakelsky has already received full satisfaction of all damages that he suffered, which accrued between July 7, 1995, and July 13, 1995.

### 3. Allegedly Abandoning Jakelsky as a Patient

 Jakelsky also claims that Dr. Friehling negligently abandoned him as a patient as of July 7, 1995, when she informed Dr. Patrognoni, but not Mr. Jakelsky, that she "[did] not see any reason ... to follow Tom [Jakelsky] any further in the office." Letter from Dr. Friehling to Dr. Patrognoni, dated July 7, 1995. There is no evidence in the summary judgment record, nor any allegations in the Amended Complaint or in the Joint Final Pretrial Order, suggesting that Jakelsky requested any treatment after July 7, 1995, and was denied such treatment, or that Dr. Friehling failed to provide some treatment between July 7, 1995, and July 13, 1995, that she should have provided. Thus, I find that even if Dr. Friehling did abandon Jakelsky as a patient on July 7, 1995, Jakelsky has made no allegations, nor presented any facts, to show that this abandonment had any impact whatsoever on the subsequent events. Accordingly, I will grant Dr. Friehling's motion for summary judgment with respect to all claims of negligence resulting from Dr. Friehling's alleged abandonment of Jakelsky.

### IV. CONCLUSION

For the reasons set forth above, I find that no reasonable jury could determine that the fatal car crash was a foreseeable result of any of Dr. Friehling's alleged acts of medical malpractice. In addition, I find that no reasonable jury could find that Dr. Friehling's alleged delay in diagnosing Jakelsky caused any damages to accrue after Dr. Friehling provided a diagnosis on April 7, 1995. ·Finally, I hold that there is no evidence in the summary judgment record to suggest that Dr. Friehling's alleged abandonment of Jak-

elsky had any effect on the events that transpired in Jakelsky's life through July 13, 1995, the last day he claims to have suffered any injuries. As a result, I conclude that the alleged abandonment could not have proximately caused any of the injuries that Jakelsky alleges he sustained. Accordingly, I will grant Dr. Friehling's motion for summary judgment with respect to: (1) Jakelsky's claims of injury as a result of the automobile accident; (2) all claims of injury that accrued after April 7, 1995, which allegedly resulted from Dr. Friehling's delay in diagnosing Jakelsky's condition; (3) all claims of injury that accrued before July 7, 1995, which allegedly resulted from Dr. Friehling's decision to provide Jakelsky with a release to return to work; and (4) all claims of injury allegedly resulting from Dr. Friehling's alleged abandonment of Jakelsky as a patient. Thus, Jakelsky is free to argue that he sustained work-related injuries from February 25, 1994 until April 7, 1995, due to Dr. Friehling's alleged failure to diagnose Jakelsky with Wilson's Disease in a timely manner, and from July 7, 1995, to July 13, 1995, as a result of Dr. Friehling's allegedly negligent decision to return Jakelsky to work.