809 A.2d 865 (2002)
355 N.J. Super. 210
Mark BERBERIAN and Emanuel Berberian, Plaintiffs-Appellants,
v.
Diana LYNN, as Guardian of the Incompetent Edmund Gernannt and Edmund Gernannt, Individually and the Estate of Edmund Gernannt, Defendants-Respondents, and
Dr. M.H. Ramay, M.D., Defendant.
Superior Court of New Jersey, Appellate Division.
Argued October 21, 2002.
Decided November 20, 2002.
*866 Michael J. Breslin, Jr., Hackensack, argued the cause for appellants (Waters, McPherson, McNeill, attorneys; Mr. Breslin, of counsel; James J. Seaman, on the briefs).
Gerard P. De Veaux argued the cause for respondent Diana Lynn (De Veaux & Seidman, attorneys; Margaret A. Sherlock, Rutherford, on the brief).
Kevin P. Harrington, North Haledon, argued the cause for respondent Edmund Gernannt (Harrington and Lombardi, attorneys; Mr. Harrington, on the briefs).
Before Judges PETRELLA, LINTNER and BILDER.
The opinion of the court was delivered by PETRELLA, P.J.A.D.
Plaintiffs, Mary Berberian and her husband *867 Emanuel Berberian,[1] filed a complaint against defendants Diana Lynn, Edmund Gernannt, and a then-unknown physician. Amended complaints added the Estate of Gernannt as a defendant after he died, and substituted Dr. M.H. Ramay, M.D., as a defendant for the unknown physician. The complaint alleged that Lynn was negligent in allowing and causing the removal of Gernannt, an adjudicated incompetent, from the psychiatric ward of Bergen Pines County Hospital (Bergen Pines) to the Bergen Pines long term care unit without restraints. Plaintiffs also alleged improper supervision and control and that Lynn breached a contract or fiduciary duty, or both, as Gernannt's guardian. Summary judgment was granted in Lynn's favor, dismissing all claims asserted against her. Summary judgment was later granted to Dr. Ramay, dismissing the complaint against him apparently due to the bar of the workers' compensation statute. The dismissal of Dr. Ramay is not the subject of this appeal.
On the last day of the jury trial against Gernannt, plaintiffs' attorney argued that a $200,000 settlement had been reached, despite his request in a counterproposal for $225,000, and plaintiff sought enforcement of the settlement. Defendant's attorney placed a high low proposal on the record in the presence of plaintiff and her attorney, but this offer was not accepted. The trial judge concluded there was no settlement and charged the jury, which thereafter returned its verdict finding Gernannt was not negligent.
Plaintiffs assert the following claims on these consolidated appeals. In their first appeal (A-4825-00T2) they argue: (1) Lynn was negligent in demanding that Gernannt be removed from the psychiatric unit and placed in the long term care unit of Bergen Pines; and (2) the judge erred in instructing the jury that Gernannt could not be found negligent if he lacked the capacity to appreciate the consequence of his actions. In their second appeal (A-414-01T2) plaintiffs argue that the judge erred in refusing to enforce a claimed settlement between the parties despite a strong public policy favoring settlements and the fact that an oral settlement is enforceable.
Lynn was awarded guardianship of her father, Gernannt, now deceased, on September 22, 1997, when it became apparent that he was no longer mentally competent or able to care for himself and was a danger to himself and others. On October 3, 1997, Gernannt was admitted to Bergen Pines[2] with a diagnosis of Senile Dementia, Alzheimer Type. On October 13, 1997, he was transferred from the Long Term Care Unit (LTCU) to the Psychiatric Unit because he "became increasingly agitated and assaultive towards the staff."
Dr. Ramay, who last treated Gernannt on November 1, 1997, did not expect that there would be any recovery of cognition by the patient. Prior to the November 11, 1997 incident, Dr. Hossain, the Chief of Geriatric Psychiatry at Bergen Pines, treated Gernannt. Both doctors testified at trial that Gernannt suffered from advanced Alzheimer's disease with severe dementia. In addition, Dr. Hossain stated that Gernannt's condition was unlikely to improve and was, in fact, progressive.
*868 On November 5, 1997, Gernannt was returned to the Alzheimer population in the LTCU after receiving medication and treatment. Plaintiff contends that when Lynn was notified that her father was placed in the Psychiatric Unit, she requested his return to the LTCU. A report by Dr. Ramay noted that when Gernannt was treated in the Psychiatric Unit, "[t]he patient's family was contacted. They wanted him in long term care." Although Lynn acknowledged concern that her father was placed in the Psychiatric Unit, she asserts she never directed the hospital doctors to transfer her father from the Psychiatric Unit to the LTCU. At her deposition she stated:
I remember being concerned about my father being in the psychiatric unit because I remembered the movie "Snake Pit" ... [a]nd I asked the doctor was he going to stay there or what the situation was ... [T]he doctor said that it was normal that within a few days time, that he would be transferred. That's what he expected, that within a few days time he would be transferred back to long term care.
Nurse Christina Maita testified that about 75% of the patients in the LTCU were Alzheimer's patients and that a patient would be transferred to the Psychiatric Unit when the patient was at risk of harming himself or others. Maita explained that the decision to transfer to and from the Psychiatric Unit involved collaboration between the doctors, nurses, and interdisciplinary team. According to Maita, during the days prior to the alleged incident, Gernannt was never physically abusive towards Maita or Berberian. She was aware that Gernannt had behavioral problems prior to the date of the incident.
At about 11:00 p.m. on November 11, 1997, Gernannt set off the alarm when he tried to leave the LTCU by the fire door exit. Maita heard the alarm and attempted to stop him. However, Gernannt resisted and pushed her away. She then summoned security. Berberian, the charge nurse for Gernannt, grabbed Gernannt in an attempt to redirect him. According to Maita, Gernannt then pushed Berberian, and she lost her balance and fell as she stepped back.
Berberian contends that when she approached Gernannt, she extended her hand to help him back to his room and he took it, and subsequently pushed her away, causing her to fall backward. As a result of the fall, Berberian fractured a bone in her right leg.

I.
We first address the factual dispute between the attorneys for the parties as to whether there was a settlement. The judge considered the circumstances and the relevant and conflicting statements by the attorneys and ruled:
I cannot enforce a settlement that was never placed on the record, that was never, as far as I recollected, accepted by plaintiff. There were discussions back and forth, it's true. There was a discussion about the [$200,000] number. I don't recollect anyone saying definitively that that would settle the case. That's how come we went to a verdict on the case, and until and unless plaintiff [was] willing to put on the record that the two-hundred was agreed to and defense agreed to pay it, the Court had no capacity to make a better bargain for the plaintiff than she could have made for herself during the proceedings.
Our scope of review of these findings is limited. Here, the judge's findings are supported by substantial credible evidence in the record and we have no basis to disturb them. Rova Farms Resort v. Investors *869 Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974).
Although plaintiffs are correct that settlement agreements are not required to be on the record to be enforceable, Pascarella v. Bruck, 190 N.J.Super. 118, 124, 462 A.2d 186 (App.Div.), certif. denied, 94 N.J. 600, 468 A.2d 233 (1983), there is insufficient basis in the record to establish that a binding settlement was reached. Rather, as the judge found, and the record reveals, the $200,000 figure was never definitively agreed upon between plaintiffs and defendant. Even, assuming arguendo plaintiffs' contentions, they terminated their ability to accept the offer of $200,000 when they proposed a counteroffer of $225,000 on March 30, 2001. Defense counsel rejected the counteroffer and proposed a high low offer. Plaintiffs' attorney later attempted to accept the original $200,000 offer, but defense counsel responded that it was no longer available. Plaintiffs' attorney contends that defense counsel never withdrew the $200,000 offer or imposed a time limit until after the offer was accepted. As defendant correctly argues, however, such withdrawal was not necessary once plaintiffs refused to unconditionally accept the $200,000 offer and instead made a counter-demand of $225,000.
A counteroffer operates as a rejection because it implies that the offeree will not consent to the terms of the original offer and will only enter into the transaction on the terms stated in the counteroffer. Fish v. Schultz, 5 N.J.Super. 403, 405, 69 A.2d 328 (App.Div.1949); 1 Willinston on Contracts § 5.3 (4th ed.1990). A counteroffer terminates the power of acceptance when it relates to the same matter as the original offer and proposes a "substituted bargain differing from that proposed by the original offer." Restatement (Second) of Contracts § 39(2), comment a (1981). Thus, plaintiffs' counteroffer of $225,000 terminated their ability to accept the $200,000 offer. The judge thus correctly concluded that no binding settlement was reached.

II.
We next address the summary judgment granted to Lynn. In considering the summary judgment issue, we apply the same standard of review as the trial court. Pinkowski v. Township of Montclair, 299 N.J.Super. 557, 565, 691 A.2d 837 (App. Div.1997). See R. 4:46-2(c).
The material facts are not disputed. Rather, plaintiffs argue that discovery was cut short by the grant of summary judgment in favor of Lynn and that she should be found negligent for influencing the hospital officials to return Gernannt to the LTCU. As the motion judge correctly concluded, Lynn cannot be held negligent because she was not the proximate cause of plaintiff's injuries. Even assuming that Lynn significantly influenced the hospital's decision to transfer Gernannt to the LTCU, that influence would not be sufficient to impose liability on Lynn for the alleged negligent actions of Gernannt. Therefore, although plaintiffs claim additional discovery is necessary to determine the amount of influence exerted by Lynn on Bergen Pine's decision to transfer Gernannt, such an inquiry would not preclude summary judgment in Lynn's favor.
Before the incident the hospital staff was on notice that Gernannt might become violent. The staff had sufficient time to become familiar with Gernannt's condition and behavior. Indeed, the medical records indicated Gernannt's tendency to become aggressive with staff members. Despite the hospital being on notice of Gernannt's condition, Berberian contends that Lynn could still be liable because she *870 allegedly insisted that her father be returned to the LTCU. Any influence that Lynn's request may have had on the staff at Bergen Pines to transfer her father, however, was not the proximate cause of plaintiff's injury. A similar claim was rejected in Prudential Society, Inc. v. Ray, 207 A.D. 496, 498, 202 N.Y.S. 614 (N.Y.App.Div.), aff'd, 239 N.Y. 600, 147 N.E. 212 (N.Y.1924). A guardian "is not liable for a remote cause, and he is only liable when the injury resulting flows directly from his omission." The incident involved here did not flow directly from any request by Lynn regarding her father's transfer. In addition, any alleged failure to disclose any violent tendencies by her father was not the proximate cause of Berberian's injuries because the hospital already had adequate notice and reports of Gernannt's behavior. Finally, it was within the hospital's discretion whether to move Gernannt from the Psychiatric Unit.[3]
Moreover, courts have been reluctant to impose liability on guardians for the actions taken by their wards, even when the individual is in custody of his or her guardian. See, e.g., Sego v. Mains, 41 Colo.App. 1, 578 P.2d 1069, 1072 (1978). Although New Jersey courts do not appear to have addressed this issue, other jurisdictions have consistently refused to impose liability on guardians in similar situations. In Kaminski v. Town of Fairfield, 216 Conn. 29, 578 A.2d 1048, 1053 (1990), the Connecticut Supreme Court noted two important factors in its determination that custodial parents were not liable to a police officer for injuries inflicted by their son: (1) the plaintiffs disclosed their son's condition when they asked for help; and (2) the defendant was acting in his professional capacity when dealing with the assailant. While some facts in the Kaminski case differ from the instant case, both the Bergen Pines staff and Berberian were aware of Gernannt's propensity for aggressive behavior and Berberian was acting in her professional capacity as his charge nurse at the time of the incident.
As guardian for her father, Lynn entrusted him to an institution that could attend to his special needs and there was nothing more that she could do to protect others from his negligent acts. See Colman v. Notre Dame Convalescent Home, Inc., 968 F.Supp. 809, 813 (D.Conn.1997) (having confined their ward to a restricted convalescent home at the time of the incidents, there was "nothing more that her guardians could have done to protect others from defendant's negligent acts"). Because Lynn was not responsible for Gernannt's actions as an institutionalized patient, or for medical staff determinations regarding his placement, Lynn cannot be held liable for any potentially negligent act he committed against a paid hospital employee.

III.
We next address the claim of error in the jury charge. When an appellant raises error in the jury charge, the charge must be read as a whole and the court will not read just the portion alleged as error. State v. Wilbely, 63 N.J. 420, 422, 307 A.2d 608 (1973). No party is entitled to have the jury charged in his or her own words. All that is necessary is that the charge as a whole be accurate. State v. Thompson, 59 N.J. 396, 411, 283 A.2d 513 (1971). Under the "harmful error" rule, an error will not be ground for *871 reversal unless it is "clearly capable of producing an unjust result." R. 2:10-2.
The judge gave the following charge on the standard of care for negligence:
Negligence may be the doing of an act which the reasonably prudent person would not have done. Or it may be the failure to do that which a reasonably prudent person would have done under the circumstances then existing.
Negligence is a departure from that standard of care by a reasonably prudent person in this case. It is not meant your average person. Because in this case you have the plaintiff has to be a reasonably prudent nurse. And you have a defendant who has to be a reasonably prudent person with diminished cognitive capacity.
So you have to determine whether each of these parties acted within the realm of what the person with their particular factors was reasonable and prudent in the way they acted, considering one was a nurse, and one was an Alzheimer's patient.
Now, in determining the standard of care that defendant, Edmund Gernannt should have used on November 11th, 1997, you must measure his actions as you would a reasonably prudent person who has Alzheimer's dementia.
This willingness to necessitate your determination from all the testimony that was given from doctors and nurses and lay people as to what level of mental functioning the defendant Gernannt had at the time of this accident.
You must take into consideration the defendant as an impaired person's capacity to understand and avoid the danger to which he was exposing plaintiff Berberian in the actual circumstances of this case.
Defendant has the burden to prove by a preponderance of evidence that defendant, Edmund Gernannt had such deficient mental capacity at the time of the accident that he had no capacity to avoid the danger of pushing the plaintiff, Mary Berberian. And you will take into consideration all of the context of what you heard about the types of information that Mr. Gernannt was able to process at the time that this accident happened.
You have to take into account what you heard about the interactions between plaintiff and defendant preceding and on the day of this accident to determine whether the defendant Gernannt has proven he had no capacity to understand the consequences of his actions. And that has to be proven to you by a preponderance of evidence.
In order to establish negligence here, it is not necessary that it be shown that either party had an evil heart or an intent to do harm to the other. Thus, each party in this case was required to exercise the foresight, the prudence, and the caution which a reasonably prudent person of their particular category would exercise under the same or similar circumstances.
You must determine whether each party, that is the plaintiff and the defendant in this case, has conformed to or departed from the standard of care that I have described to you.
During its deliberations, the jury asked whether it need be shown that Gernannt was aware of the consequence of his actions in order to be found negligent. In response to this jury inquiry, the judge instructed the jury that:
The answer to your question is, no, the plaintiff doesn't have to prove that to you. Without more on the record by the defense side, the plaintiff has shown you that the defendant pushed her.

*872 A person who pushes another person is responsible for the consequences of that act. The defendant has to prove to you that the status of this man's mind was such that he could not appreciate the danger in which he placed another. Not the exact consequences that happened, just that he could not appreciate the danger he placed Mrs. Berberian in by pushing her.
And he hadthe defendant has to prove to you that he had either no capacity to appreciate that danger or he had such diminished capacity to appreciate it that he didn't have any appreciation of the danger to which he placed Mrs. Berberian on November 11th, of 1996. But it's defendant's burden to prove that to you.
If they have proven that to you, then that's correct, that the defendant, Mr. Gernannt couldn't be found negligent. But if they have not proven to you that he lacked the capacity to appreciate the danger he placed Mrs. Berberian in, then he would havehe is negligent. And you would have to say yes, he was negligent as far as pushing Mrs. Berberian.
So you have to find whether defendant proved that the defendant's mind was such that he couldn't appreciate the danger.
Plaintiffs claim that the instruction that Gernannt could not be found negligent if he lacked the capacity to appreciate the consequences of his actions was erroneous. Plaintiffs argue that the standard upon which the negligence of a mentally deficient person is determined should be the reasonable person standard in Model Jury Charge (Civil) § 5.10 Negligence and Ordinary Caregeneral, without regard to his or her mental illness or deficiency. In support of their argument plaintiffs note that this principle is included in the Restatement, (Second) of Torts (1965), that several cases state that mental incompetence does not excuse an individual tortfeasor, and that the Restatement rule was relied upon in Stuyvesant Assoc. v. Doe, 221 N.J.Super. 340, 341, 534 A.2d 448 (Law Div.1987). In pertinent part, the Restatement (Second) of Torts, § 283B (1965) provides:
Unless the actor is a child, his insanity or other mental deficiency does not relieve the actor from liability for conduct which does not conform to the standard of a reasonable man under like circumstances.
This standard, however, does not apply to the circumstances of the case at hand. Stuyvesant did not address an individual committed to a mental institution, and under its care, but rather a defendant-tenant who had been diagnosed as schizophrenic and who received regular injections as treatment to control his behavior. The Law Division Judge noted the cited Restatement of Torts section and concluded that a reasonable person under the same circumstances as defendant would be expected to get the injections as scheduled. Stuyvesant, supra (221 N.J.Super. at 343, 534 A.2d 448). Consequently, the tenant allowed his condition to result in the damages to the premises and warranted his eviction and a judgment for possession. Ibid.
While recognizing the Restatement of Torts principle that mental disability does not generally excuse a person from liability for conduct that does not conform to the standard of a reasonable person under like circumstances, several courts in other jurisdictions have nonetheless considered the mental capacity of an adult with mental disabilities when determining the potential negligence liability of institutionalized Alzheimer's patients. See, e.g., Creasy v. Rusk, 730 N.E.2d 659, 666-667 (Ind.2000) *873 (Alzheimer's patient owed no duty to his nursing assistant to refrain from violent behavior because he did not have the capacity to control his behavior and the relationship between the parties as well as public policy considerations, weigh against imposing liability). As a result, other states have not imposed liability on institutionalized patients for injuries suffered by a paid hospital attendant as a result of a patient's negligence. Colman, supra (968 F.Supp. at 813) (citing Herrle v. Estate of Marshall, 45 Cal.App.4th 1761, 53 Cal. Rptr.2d 713, 716 (1996)); Gould v. American Family Mutual Ins. Co., 198 Wis.2d 450, 543 N.W.2d 282, 283 (1996) (institutionalized individual cannot be liable for injuries caused to caretakers who are employed for financial compensation); Mujica v. Turner 582 So.2d 24, 25 (Fla.Dist.Ct. App.1991) (holding physical therapist could not recover from nursing home patient suffering from Alzheimer's disease who injured her). Cf. Gianni v. County of Bergen, 251 N.J.Super. 486, 598 A.2d 933 (App.Div.1991), certif. denied, 127 N.J. 565, 606 A.2d 375 (1992) (no liability of Bergen Pines County Hospital under Tort Claims Act where one patient injures another).
No New Jersey cases directly address the standard of care that should be applied for an institutionalized Alzheimer's patient in a negligence case involving hospital personnel charged with his care. However, a similar issue was addressed in Cowan v. Doering, 111 N.J. 451, 459-460, 545 A.2d 159 (1988), where a patient being treated for an overdose of sleeping pills in an earlier suicide attempt, jumped from a second story hospital room window in another suicide attempt. The Court adopted a flexible capacity-based standard for the contributory negligence of mentally disturbed plaintiffs which measures the conduct of such a plaintiff in light of his or her mental capacity and is similar to that used for infant plaintiffs. Ibid. In particular, Cowan noted that this standard "recognizes that a mentally disturbed plaintiff is not capable of adhering to a reasonable person's standard of self-care, but at the same time holds that plaintiff responsible for the consequences of conduct that is unreasonable in light of the plaintiff's capacity." Id. at 460, 545 A.2d 159.
We conclude that the analysis in Cowan for mentally disturbed plaintiffs in contributory negligence cases should likewise apply to mentally disturbed defendants in negligence cases,[4] particularly when institutionalized for care for that very condition. Thus, the appropriate capacity-based standard of care for mentally incompetent defendants, such as Gernannt, is that of a reasonable prudent person who has Alzheimer's disease in light of the defendant's capacity. The trial judge appropriately explained to the jury that it must take into account that Gernannt was an Alzheimer's patient with an impaired capacity to understand the consequences of his actions. The judge also explained that Gernannt could not be found negligent if the defense had proven to the jury that Gernannt had such a diminished capacity that he could not appreciate the danger in which he placed his care-giver, Berberian, on the date of the incident.
The jury charge here was consistent with Cowan and decisions in other jurisdictions that have addressed the negligence liability of mentally disturbed individuals, including Alzheimer's patients. In our view, the flexible capacity-based standard is appropriate when considering the potential negligence liability of Alzheimer's patients, such as Gernannt, towards their *874 care-givers, and we conclude such relaxation of the reasonable person standard was appropriate here. Thus, the trial judge properly instructed the jury to consider Gernannt's mental disability when determining his liability, and explained that Gernannt could not be found negligent if the jury determined that he lacked the capacity to understand the consequences of his actions.
Because the jury absolved Gernannt of liability it is not necessary for us to reach defendant's alternative argument that the trial judge should have granted an involuntary dismissal under the circumstances of Berberian's claim based upon Gernannt's incompetency.
Affirmed.
LINTNER, J.A.D. (concurring).
Although I concur with the decision and the result, I add this concurrence because I believe that under the facts of this case the trial judge should have granted Gernannt's motion for involuntary dismissal.
The facts here justify diverting from the widely accepted rule that mentally incompetent individuals are held to an objective reasonable standard of care and are thus responsible for the torts they commit regardless of their capacity to comprehend their actions. Restatement (Second) of Torts § 283B (1965). It is undisputed that at the time of the incident Gernannt was suffering from Alzheimer's, being institutionalized and cared for because of his disease. His Alzheimer's was permanent, progressive and rendered him severely demented. It formed the basis for entry of a prior judgment that he was mentally incompetent, thus unable to care for himself, being a danger to himself and others. There was no issue of fact that Gernannt lacked the capacity to understand the consequences of his actions.
Plaintiff was the charge nurse employed by the hospital to care for Gernannt's behavioral condition, the nature of which was known by the staff. The conduct for which plaintiff seeks to hold Gernannt liable was the reason he was institutionalized and under her care. I do not suggest that a person's mental incompetency standing alone is sufficient to establish a defense to negligence. There are a myriad of different mental illnesses which are very complex and, depending upon the circumstances of each individual case, may or may not require consideration by a jury. There is no need, therefore, to depart from the general rule that mentally disabled persons are responsible for their tortious acts. However, I am equally convinced that the general rule does not apply to the circumstances here. To hold that Gernannt had a duty would be to place too great a burden on him because his dementia and corresponding inability to act reasonably, and even violently, is the very reason for his being institutionalized and under the care of plaintiff. Gould v. American Family Mut. Ins. Co., 198 Wis.2d 450, 543 N.W.2d 282, 283 (1996); see also Colman v. Notre Dame Convalescent Home, Inc., 968 F.Supp. 809, 813 (D.Conn.1997); Herrle v. Estate of Marshall, 45 Cal.App.4th 1761, 53 Cal.Rptr.2d 713, 716 (1996); Mujica v. Turner, 582 So.2d 24, 25 (Fla.Dist.Ct.App.1991); Creasy v. Rusk, 730 N.E.2d 659, 666-67 (Ind.2000).
This rationale is not unique. It is the same reasoning that gave rise to the fireman rule.
[T]he fireman's business [is] to deal with that very hazard and hence ... he cannot complain of negligence in the creation of the very occasion for his engagement. In terms of duty, it may be said there is none owed the fireman to exercise care so as not to require the *875 special services for which he is trained and paid.
[Krauth v. Geller, 31 N.J. 270, 273-74, 157 A.2d 129 (1960); see also Berko v. Freda, 93 N.J. 81, 85, 459 A.2d 663 (1983).]
Although the result would be the same, I believe the judge erred in denying Gernannt's motion for involuntary dismissal, R. 4:37-2(b), and thus it would have been unnecessary to have a jury trial.
NOTES
[1] Emanuel Berberian asserted a per quod claim. References to plaintiff or Berberian in this opinion refer to Mary Berberian unless otherwise indicated.
[2] Bergen Pines is a county hospital and thus a public entity. See Gianni v. Bergen Pines County Hospital, 251 N.J.Super. 486, 598 A.2d 933 (App.Div.1991), certif. denied, 127 N.J. 565, 606 A.2d 375 (1992).
[3] Dr. Ramay testified at deposition that a multi-team approach, involving the family doctor, and long term care staff, is used to determine whether to transfer the patient. After considering these factors, the doctor made the final decision regarding the transfer of Gernannt.
[4] What occurred could also be viewed as an intentional act by defendant, but it is questionable that the requisite intent could be established.