*845 A.2d 122*

MARY BERBERIAN AND EMMANUEL BERBERIAN, PLAINTIFFS–APPELLANTS, v. DIANA LYNN, AS GUARDIAN OF THE INCOMPETENT EDMUND GERNANNT, EDMUND GERNANNT, INDIVIDUALLY, DR. M.H. RAMAY, M.D., AND JOHN DOE, INC., A FICTITIOUS ENTITY, JOINTLY, SEVERALLY AND IN THE ALTERNATIVE, DEFENDANTS, AND THE ESTATE OF EDMUND GERNANNT, DEFENDANT–RESPONDENT.

Argued November 3, 2003—Decided April 6, 2004.

*Michael J. Breslin, Jr.,* argued the cause for appellants (*Waters, McPherson, McNeill,* attorneys; *James J. Seaman,* on the briefs).

*Kevin P. Harrington,* argued the cause for respondent (*Harrington and Lombardi,* attorneys).

Justice WALLACE delivered the opinion of the Court.

Plaintiffs,[1] Mary Berberian, the head nurse in a long-term care facility, and her husband, Emmanuel Berberian, sued defendant Edmund Gernannt, an institutionalized patient with Alzheimer's dementia, his estate (defendant)[2], Diane Lynn, in her capacity as Gernannt's guardian, and M.H. Rainey, M.D., to recover damages for personal injuries she sustained when Gernannt pushed her. After closing arguments, the trial court instructed the jury that the applicable standard of negligence was that of "a reasonably prudent person who has Alzheimer's dementia." The jury found in favor of defendant. On appeal, plaintiffs argued that the trial court should have applied an objective "reasonable person" standard without taking into account Gernannt's mental disability. The Appellate Division disagreed with plaintiffs and affirmed the trial court. *Berberian v. Lynn*, 355 *N.J.Super.* 210, 809 *A.*2d 865 (2002). We granted certification, 175 *N.J.* 549, 816 *A.*2d 1050 (2003), and now affirm the judgment of the Appellate Division on different grounds. We hold that mentally incompetent patients owe no duty of care to protect paid caregivers from injuries suffered while caring for those patients.

## I.

On October 3, 1997, Gernannt, now deceased, was involuntarily committed to Bergen Pines County Hospital (Bergen Pines) with a diagnosis of senile dementia, Alzheimer's type. On October 13, 1997, he was transferred from the long-term care unit to the acute geriatric psychiatric unit because he became increasingly agitated and assaultive towards the staff. On November 5, 1997, Gernannt was transferred to the eighth floor, where a number of other Alzheimer's and dementia patients were housed.

---

[1] When used in the singular, plaintiff refers to Mary Berberian.

[2] When used in the singular, defendant refers to Gernannt's estate. Due to Gernannt's death, his estate was the sole defendant at trial.

Plaintiff first met Gernannt on November 8, 1997. At that time, she was a nurse supervisor in the long-term care unit and had over twenty years of experience working with Alzheimer's patients. She knew that Gernannt had dementia and a history of agitation, including prior acts of violence towards staff. With respect to that behavior, plaintiff reported in her notes that Gernannt "refused to go to bed[,] ... was combative, agitated," and "[t]ried to hit staff." Plaintiff was also aware of the Bergen Pines standard patient aggression policy. That policy stated that if a patient with dementia is violent, aggressive, resistant or unredirectable, the nurse should retreat from the patient and call security for assistance.

On November 11, 1997, Gernannt attempted to leave the unit by way of the fire exit and set off the alarm. Nurse Christine Schell tried to redirect him, but he began hitting her. Schell backed away and walked down the hall to call security. Plaintiff then approached him and extended her hand to help him to his room. Gernannt grabbed plaintiff's hand, pulled her toward him and then pushed her back, causing her to fall and fracture her right leg.

On January 26, 1998, plaintiffs filed a complaint against Lynn, Gernannt, and a fictitious designee. The complaint was later amended to add Gernannt's estate after he died, and to substitute Dr. Rainey as a defendant in place of the fictitious designee. While not disputing that Gernannt was an adjudicated incompetent, plaintiffs alleged that he, "without provocation negligently, recklessly and carelessly" struck plaintiff, causing her injuries. Further, the complaint alleged that Lynn was negligent for allowing Gernannt's transfer from the psychiatric ward to the long-term care unit without restraints. The trial court granted the summary judgment motions of Lynn and Dr. Rainey, and plaintiffs do not appeal those judgments.

The balance of the case proceeded to trial. At the conclusion of plaintiffs' presentation of evidence, defendant moved for an involuntary dismissal. Defendant stressed that there was no dispute as to Gernannt's mental incompetence, but only as to whether, in

this condition, he was capable of negligence. Plaintiffs' counsel argued that mentally disabled adults, regardless of their capacity to comprehend their actions, should be held to an objective, reasonable person standard. The trial court denied the motion for involuntary dismissal.

After the close of the evidence portion of the trial, plaintiffs requested a "reasonable man" standard instruction. The trial court denied the request and charged as follows:

> Now in determining the standard of care that defendant, Edmund Gernannt should have used on November 11th, 1997, you must measure his actions as you would *a reasonably prudent person who has Alzheimer's dementia.*
>
> . . . .
>
> You must take into consideration the defendant as an impaired person's capacity to understand and avoid the danger to which he was exposing plaintiff Berberian in the actual circumstances of this case.
>
> Defendant has the burden to prove by a preponderance of evidence that defendant, Edmund Gernannt had such deficient mental capacity at the time of the accident that he had no capacity to avoid the danger of pushing the Plaintiff, Mary Berberian.
>
> [Emphasis added.]

During deliberations, the jury questioned whether plaintiffs needed to show that Gernannt was aware of the consequences of his actions in order for him to be found negligent. In response to the jury's inquiry, the trial court replied:

> [T]he defendant has to prove to you that he had either no capacity to appreciate that danger or he had such diminished capacity to appreciate it that he didn't have any appreciation of the danger to which he placed Mrs. Berberian on November 11th of 1996. But it's defendant's burden to prove that to you.

The jury returned a verdict in favor of defendant.

Plaintiffs appealed. The Appellate Division affirmed, holding that "the appropriate capacity-based standard of care for mentally incompetent defendants, such as Gernannt, is that of a reasonable prudent person who has Alzheimer's disease in light of the defendant's capacity." *Berberian, supra,* 355 *N.J.Super.* at 223, 809 *A.*2d at 873. In a concurring opinion, Judge Lintner concluded that Gernannt had no duty of care because his "dementia and corresponding inability to act reasonably ... is the very reason for his being institutionalized and under the care of plaintiff." *Id.*

at 225, 809 *A*.2d at 874 (citations omitted). Based on that reasoning, Judge Lintner concluded that the trial court should have granted defendant's motion for involuntary dismissal. *Ibid.*

## II.

Plaintiffs contend that it was error to use a capacity-based standard of care for the mentally incompetent Gernannt. Plaintiffs urge that this Court's ruling in *Cowan v. Doering,* 111 *N.J.* 451, 545 *A.*2d 159 (1988), which held that capacity-based standards should be used in comparative negligence cases against mentally disturbed persons, does not apply here. They assert that the major concern underlying the capacity-based doctrine announced in *Cowan* was the general protection of plaintiffs, not defendants. Further, plaintiffs argue that the decision below will undermine the tort law system, and that the decision is unwarranted and unfair. Finally, plaintiffs contend that the "fireman's rule" should not apply to healthcare workers because it may lead to less responsive health care in the future.

Defendant responds that the Appellate Division properly applied a capacity-based standard and that *Cowan* provides legal support for that standard. In addition, defendant agrees with Judge Lintner's concurring opinion that the trial court should have granted an involuntary dismissal of the negligence claim based on the "fireman's rule" rationale.

## A.

■ Generally, the reasonable person standard applies to a mentally deficient person. *Restatement (Second) of Torts* § 283B (1965) provides that:

Unless the actor is a child, his insanity or other mental deficiency does not relieve the actor from liability for conduct which does not conform to the standard of a reasonable man under like circumstances.

"The rule that a mentally deficient adult is liable for his torts is an old one, dating back at least to 1616, at a time when the action for

trespass rested upon the older basis of strict liability, without regard to any fault of the individual." *Id.* at § 283B comment b.

The rule's persistence in modern law has been justified on the following grounds:

1. The difficulty of drawing any satisfactory line between mental deficiency and those variations of temperament, intellect, and emotional balance which cannot, as a practical matter, be taken into account in imposing liability for damage done.

2. The unsatisfactory character of the evidence of mental deficiency in many cases, together with the ease with which it can be feigned, the difficulties which the triers of fact must encounter in determining its existence, nature, degree, and effect; and some fear of introducing into the law of torts the confusion which has surrounded such a defense in the criminal law. Although this factor may be of decreasing importance with the continued development of medical and psychiatric science, it remains at the present time a major obstacle to any allowance for mental deficiency.

3. The feeling that if mental defectives are to live in the world they should pay for the damage they do, and that it is better that their wealth, if any, should be used to compensate innocent victims than that it should remain in their hands.

4. The belief that their liability will mean that those who have charge of them or their estates will be stimulated to look after them, keep them in order, and see that they *do not do harm.*

[*Ibid.*]

The Restatement identifies a "reasonable person" as "a person exercising those qualities of attention, knowledge, intelligence, and judgment which society requires of its members for the protection of their own interests and the interests of others." *Id.* at § 283 comment b. Further, it recognizes that "allowances must be made for some of the differences between individuals, the risk apparent to the actor, his capacity to meet it, and the circumstances under which he must act." *Id.* at § 283 comment c. However, the Restatement limits the distinction with respect to the standards of care governing the tort liability of children and *physically* disabled persons, but *not mentally* disabled persons. *See id.* at § 283A (providing that a child must conform his or her conduct to that of "a reasonable person of like age, intelligence, and experience under like circumstances"); *see also id.* at § 283C (providing that a physically disabled individual must conform his or her conduct to "that of a reasonable man under like disability").

## B.

■ The issue on appeal is one of first impression in New Jersey. Both parties cite *Cowan* to support their respective positions. In *Cowan, supra,* the mentally disturbed plaintiff was treated in a hospital for an overdose of sleeping pills. 111 *N.J.* at 453, 545 *A.*2d at 160. During her stay, she jumped from her hospital room window and was seriously injured. *Ibid.* The plaintiff sued her treating physician and nurses for negligently failing to protect her from self-injury. *Ibid.* The trial court refused to instruct the jury on comparative negligence and the plaintiff recovered a judgment against the defendants. *Ibid.* On appeal, the Appellate Division affirmed, finding that the "plaintiff committed the very act that [the] defendants were under a duty to prevent." *Cowan v. Doering,* 215 *N.J.Super.* 484, 495, 522 *A.*2d 444, 450 (1987).

This Court also affirmed, holding that a plaintiff is excused "from exercising reasonable self-care only when that duty is itself encompassed by the duty of care owed by the defendant to the plaintiff." *Cowan, supra,* 111 *N.J.* at 460, 545 *A.*2d at 163. The Court noted that the "defendants were aware of the plaintiff's propensity for self-damaging acts," her "history of such conduct," her "attempted suicide that same morning," and they "understood [her] personality disorder." *Id.* at 464, 545 *A.*2d at 165. In light of the above facts, the Court found that the defendant professional health care workers breached their duty to "treat [the plaintiff] for this disorder and to treat her for the manifestations or symptoms of the disorder, namely, suicidal or other self-harmful acts." *Id.* at 464, 545 *A.*2d at 166.

In addition, the Court explained that "[t]his standard recognizes that a mentally disturbed plaintiff is not capable of adhering to a reasonable person's standard of self-care, but at the same time holds that plaintiff responsible for the consequences of conduct that is unreasonable in light of the plaintiff's capacity." *Id.* at 460, 545 *A.*2d at 163. The Court noted that a capacity-based standard was congruent with its previous holding that recognized a rebutta-

ble presumption of incapacity for children under seven years old, but also found that a child's conduct should be measured in light of his or her capacity to exercise care under all attendant circumstances. *Id.* at 459, 545 *A.*2d at 163 (citing *Bush v. New Jersey & New York Transit Co.*, 30 *N.J.* 345–55, 153 *A.*2d 28–34 (1959)).

A similar result was reached in *Tobia v. Cooper Hosp. Univ. Med. Ctr.*, 136 *N.J.* 335, 643 *A.*2d 1 (1994). There, an elderly patient was injured when she fell from an emergency room stretcher. *Id.* at 339, 643 *A.*2d at 2–3. According to the plaintiff, the attendant had lowered the side rails, failed to lock the wheels, and left the area. *Ibid.* The plaintiff fell while attempting to get off of the unlocked stretcher. *Ibid.* The Court held that a health care professional may not assert comparative negligence as a defense when a professional's duty includes the exercise of reasonable care to prevent the patient from engaging in self-damaging conduct. *Id.* at 338, 643 *A.*2d at 2.

## C.

While *Cowan* and *Tobia* tangentially inform this case, decisions from other jurisdictions with fact patterns closer to the present case are also instructive.

An early case creating an exception to the Restatement's rule governing tort liability for the mentally incompetent was *Anicet v. Gant*, 580 *So.*2d 273 (Fla.Dist.Ct.App.), *review denied*, 591 *So.*2d 181 (Fla.1991). In *Anicet*, the defendant, a violently insane patient, injured the plaintiff, a hospital attendant responsible for treating and restraining the defendant. *Id.* at 274. The plaintiff was aware of the defendant's propensity for violence. *Ibid.* The court held that "no duty to refrain from violent conduct arises on the part of a person who has no capacity to control it to one who is specifically employed to do just that." *Id.* at 277 (citations omitted).

The court's decision was based largely on an analysis of the parties' relationship. First, the court indicated that the plaintiff was not wholly innocent because "he was employed to encounter,

and knowingly did encounter, just the dangers which injured him."
*Id.* at 276. The court found the "fireman's rule" analogous, and
quoted one of this Court's rulings:

> Stated affirmatively, what is meant is that it is the fireman's business to deal with
> that very hazard and hence, ... he cannot complain of negligence in the creation of
> the very occasion for his engagement. In terms of duty, it may be said there is
> none owed the fireman to exercise care so as not to require the special services for
> which he is trained and paid.
>
> [*Ibid.* (quoting *Krauth v. Geller*, 31 *N.J.* 270, 273–74, 157 *A.*2d 129, 131 (1960)).]

Second, the Florida court noted the existence of workers' com-
pensation for the injured plaintiff. *Ibid.* Third, while analyzing
the defendant's condition, the court opined that it would be unjust
to impose liability on a defendant, "who has no control over his
actions and is thus innocent in any wrongdoing in the most basic
sense of the term." *Ibid.* Finally, the court recognized that the
defendant, his relatives, and society did as much as they could to
protect others from the defendant's violence by confining him in
the most restricted area of a restricted institution. *Ibid.*; *see also*
*Mujica v. Turner*, 582 *So.*2d 24, 25 (Fla.Dist.Ct.App.), *review
denied*, 592 *So.*2d 681 (Fla.1991) (following *Anicet* to conclude that
no liability attaches "when the incompetent has been institutional-
ized ... because of her mental incompetency and injures one of
her caretakers while in such institution.")

In *Gould v. American Family Mut. Ins. Co.*, 198 *Wis.*2d 450,
543 *N.W.*2d 282, 283 (1996), the Supreme Court of Wisconsin
addressed whether an institutionalized individual who has a men-
tal disability and who does not have the capacity to control or
appreciate his or her conduct can be liable for injuries caused to
his or her paid caretaker. There, the plaintiff was the head nurse
at a health center's dementia unit and took care of the defendant,
an Alzheimer's patient. *Ibid.* The center's records indicated that
the defendant was often disoriented, resistant to care, and occa-
sionally combative. *Ibid.* On one occasion, the plaintiff attempted
to redirect the defendant to his own room by touching him on the
elbow. *Ibid.* In response, he knocked her to the floor, causing the
plaintiff to suffer personal injuries. *Ibid.*

The plaintiff sued the defendant's insurer. *Id.* at 284. At trial, the court instructed the jury to disregard any evidence related to the defendant's mental condition and to determine his negligence under the objective, reasonable person standard. *Ibid.* On interlocutory appeal, the appellate court reversed the judgment, holding that "a person may not be held civilly liable where a mental condition deprives that person of the ability to control his or her conduct." *Gould v. American Family Mut. Ins. Co.*, 187 *Wis.*2d 671, 523 *N.W.*2d 295, 296 (Ct.App.1994). The Supreme Court of Wisconsin affirmed and held that "an individual institutionalized ... with a mental disability, and who does not have the capacity to control or appreciate his or her conduct cannot be liable for injuries caused to caretakers who are employed for financial compensation." *Gould, supra,* 543 *N.W.*2d at 283.

First, the court reasoned that "[the plaintiff], as head nurse of the secured dementia unit and [the defendant's] caretaker, had express knowledge of the potential danger inherent in dealing with Alzheimer's patients in general and [the defendant] in particular." *Id.* at 287. Second, the court declared that it would be unfair to find the defendant negligent under those circumstances because his disorientation and potential for violence were the very reasons he was institutionalized. *Ibid.* Third, the court noted that the defendant's relatives should not be held responsible because they did everything they could to restrain him when they placed him in a secured dementia unit of a restricted health care center. *Ibid.* Lastly, the court rejected the argument that the Restatement's objective standard of care should be applied to prevent tortfeasors from "simulat[ing] or pretend[ing] insanity to defend their wrongful acts." *Ibid.* (quoting *German Mut. Fire Ins. Soc'y v. Meyer,* 218 *Wis.* 381, 261 *N.W.* 211, 215 (1935) (internal quotation marks omitted)). The court explained that the notion of a person simulating the symptoms of Alzheimer's disease over a period of years in order to avoid future liability was simply not believable. *Ibid.*

Recently, the Supreme Court of Indiana held that no duty of care exists between a mentally disabled individual residing in a nursing home and a professional health care worker employed by the nursing home. *Creasy v. Rusk*, 730 *N.E.*2d 659 (Ind.2000). There, the plaintiff, a certified nursing assistant, sued the defendant, a patient with Alzheimer's disease, for personal injuries that resulted when he kicked her while she was trying to put him to bed. *Id.* at 660–61. The plaintiff knew the defendant had Alzheimer's disease and was aware of his combative and resistant behavior resulting from the disease. *Id.* at 661. The court held that, due to the relationship between the parties and public policy concerns, the defendant owed no duty of care to the plaintiff. *Id.* at 667. The court further found the fireman's rule to be an analogous situation. *Id.* at 668; *see also Herrle v. Estate of Marshall*, 45 *Cal.App.*4th 1761, 53 *Cal.Rptr.*2d 713, 719 (1996) (holding "mentally incompetent patients should not owe a legal duty to protect caregivers from injuries suffered in attending to them"); *Colman v. Notre Dame Convalescent Home, Inc.*, 968 *F.Supp.* 809, 814 (D.Conn.1997) (observing that "although a mentally disabled adult ordinarily is responsible for the injuries resulting from her negligence, no such duty of care arises between an institutionalized patient and her paid caregiver").

### D.

Several legal commentators favor the use of a no-duty rule in the relationship between the mentally disabled patient and his or her caregiver. *See* Edward P. Richards, *Public Policy Implications of Liability Regimes for Injuries Caused by Persons with Alzheimer's Disease*, 35 *Ga. L. Rev.* 621, 639–47 (2001); Sarah Light, *Rejecting the Logic of Confinement: Care Relationships and the Mentally Disabled Under Tort Law*, 109 *Yale L.J.* 381, 400 (1999). Professor Richards argues in favor of the no-duty rule and, like the decisions analyzed above, recognizes some commonalities between the caregiver's situation and that of a fireman, who is subject to the fireman's rule. Richards, *supra*, 35 *Ga. L. Rev.*

at 641–47.  He notes that taxpayers who contract for fire services are similar to nursing home residents who contract for care with nursing homes.  *Id.* at 646.  However, he points out the nursing home then enters into a contract with the caregivers to perform the hands on care the residents need.  *See Ibid.* (citations omitted).  Noting there is no direct contract between the residents and the caregivers, he states that "caregivers accept that their compensation [for any injuries caused by a patients aggression] will be limited to that available through workers' compensation."  *Ibid.* Thus, the burden of compensating health care workers injured by mentally disabled patients shifts to the employer through the patients' contract for care.  *Ibid.* Professor Richards favors that approach because it focuses on "the contractual reallocation of the method and form of compensation, . . . obviates the need to assess the competence of the patient[,] and . . . removes the patient as a party to the litigation."  *Id.* at 646–47.

### III.

We are persuaded by the reasoning of Judge Lintner and the out-of-state authorities.  We hold that a mentally disabled patient, who does not have the capacity to control his or her conduct, does not owe his or her caregiver a duty of care.

Here, Gernannt was declared mentally incompetent by a probate court and his daughter was appointed guardian prior to his institutionalization.  Thus, there is no dispute that Gernannt did not have the mental capacity to appreciate the consequence of his conduct, and there is no concern that he was feigning his symptoms.  Most important, Gernannt was involuntarily admitted to Bergen Pines to prevent the very type of injury that is at the center of this lawsuit.

Conversely, plaintiff had knowledge of Gernannt's potential for violence and was trained to enlist the assistance of security when necessary.  Plaintiff could readily control her behavior to deal with the foreseeable harm.  In these circumstances, it would not be fair to impose a duty of care on Gernannt to his professional

caregiver when the caregiver's job duties included preventing Gernannt from injuring himself and others. Moreover, plaintiff has the benefit of worker's compensation for her work-related injuries.

In sum, the professional caregiver's situation poses concerns much like those underlying the fireman's rule. Like a fireman who chooses his or her profession and accepts the risks engendered by another's negligence in starting fires, *see Krauth v. Geller*, 31 *N.J.* 270, 273–74, 157 *A.*2d 129, 130–31 (1960) (holding a homeowner does not owe a firefighter a duty of care with respect to a negligently caused fire), the professional caregiver chooses his or her profession and willingly accepts the risk engendered by another's poor mental health. Just as a fireman has an obligation to deal with the hazards of another's burning building, *see ibid.*, the professional caregiver has the obligation to deal with the hazards of a patient's uncontrollable conduct. Thus, the professional caregiver may not recover for the conduct of a patient when this conduct is, in part, the reason for the caregiver's role. Consequently, the trial court should have granted defendant's motion for an involuntary dismissal.

## IV.

As modified, the judgment of the Appellate Division is affirmed.

*For affirming*—Chief Justice PORITZ and Justices LONG, VERNIERO, LaVECCHIA, ZAZZALI, WALLACE, and ALBIN—7.

*Opposed*—None.